## THOMPSON v. SAINT NICHOLAS NATIONAL BANK.

ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.

No. 49. Argued November 17, 18, 1892. — Decided November 28, 1892.

Where T. deposited with C., his broker, coupon railroad mortgage bonds, as margin for purchases of stocks, and C. pledged the bonds to a national bank, in 1874, as its customer, as collateral security for any indebtedness he might owe to the bank, and afterwards the bank paid and advanced for C. money on the faith of the bonds, and on like faith certified checks drawn on it by C., when C. had not on deposit in the bank moneys equal in amount to the checks: *Held*, under the act of March 3d, 1869, c. 135, (15 Stat. 335,) now § 5208 of the Revised Statutes, that, although the certifications were unlawful, the checks certified were good and valid obligations against the bank.

The pledge of the bonds with the bank by C. was a valid contract, and entirely aside from the certifications; and the title of the bank to the bonds was not impaired by the certifications.

Where the provisions of the national banking act prohibit certain acts by banks or their officers, without imposing any penalty or forfeiture applicable to particular transactions which have been executed, their validity can be questioned only by the United States, and not by private parties.

THIS was an action brought by John B. Thompson, in the Supreme Court of the State of New York, against the Saint Nicholas National Bank of New York, a national banking association. The complaint alleged that on the 18th of April, 1874, the plaintiff was the owner of 73 mortgage bonds, of $1000 each, of the Jefferson, Madison and Indianapolis Railroad Company, and 20 mortgage bonds, of $1000 each, of the Indianapolis, Bloomington and Western Railroad Company, of the value of $150,000; that on or about that date the defendant became wrongfully and illegally possessed of the bonds; and that, before the suit was brought, the plaintiff demanded from the defendant the possession of them, but the defendant refused to deliver up any portion thereof.

The answer of the defendant set up that, at the time named in the complaint and for a long time before, Capron & Merriam, bankers and brokers in the city of New York, were

customers of, and regular depositors with, the defendant, and kept a large account in its bank; that it was the custom of Capron & Merriam to procure call loans, advances and discounts from the defendant, for the benefit of themselves and also of their customers, and they pledged to the defendant, as collateral security for such loans, advances and discounts, various bonds, stocks and commercial paper, under an agreement on their part that in case they should be at any time indebted to the defendant for money lent or paid to them or for their use, in any sum, the defendant might then sell, in its discretion, at the brokers' board, public auction or private sale, without advertising and without notice, any and all collateral securities and property held by ,the defendant for securing the payment of such debt, and apply the proceeds to that object; that the bonds specified in the complaint were a part of the securities so pledged by Capron & Merriam to the defendant; that the defendant, at the time of such transactions, did not have any knowledge in respect to any person interested in such loans or in said securities, except Capron & Merriam, and the latter having failed to pay such loans on proper demand, the defendant proceeded to sell and dispose of said securities, pursuant to such agreement, and gave to Capron & Merriam credit for the net proceeds thereof; and that there still remained due to the defendant, on account of such loans and advances, after such credit, a large balance.

The plaintiff having died, and his executors having been substituted as plaintiffs, the case was tried at a circuit of the Supreme Court before a jury, which, under the direction of the court, found a verdict for the defendant. The exceptions of the plaintiffs, taken at the trial, were heard in the first instance at the general term of the Supreme Court, on a case made by the plaintiffs, containing the exceptions. A motion for a new trial was made thereon before the general term, and was denied, with an order that the defendant have judgment against the plaintiffs upon the verdict, with costs. Such judgment was entered, the principal portion of the opinion of the general term being reported in 47 Hun, 621. The plaintiffs then appealed to the Court of Appeals, which affirmed the

judgment and remitted its own judgment to the Supreme
Court, where a final judgment was entered against the plain-
tiffs. The opinion of the Court of Appeals is reported in 113
N. Y. 325. The plaintiffs have brought a writ of error.

The 93 bonds in question were all coupon bonds, payable to
bearer. The testator of the plaintiffs delivered them to Capron
& Merriam, who were his brokers, as margin for purchases of
stocks by them for his account. Capron & Merriam pledged
the bonds to the defendant, they being its customers, as col-
lateral security for the repayment of any indebtedness which
might exist at any time to it on their part. That pledge was
made under a written agreement, dated December 2, 1873,
and signed by Capron & Merriam, which read as follows:
"We hereby agree with the St. Nicholas National Bank of
New York, in the city of New York, that in case we shall be-
come or be at any time indebted to said bank for money lent
or paid to us or for our account or use, or for any overdraft,
in any sum or amount then due and payable, the said bank
may, in its discretion, sell at the broker's board or at public
auction or private sale, without advertising the same and with-
out notice to us, all, any and every collateral securities, things
in action and property held by said bank for securing the
payment of such debt, and apply the proceeds to the payment
of such indebtedness, the interest thereon, and the expenses of
the sale, holding ourselves responsible and liable for the pay-
ment of any deficiency that shall remain unpaid after such
application." Afterwards, the defendant paid and advanced
for Capron & Merriam large sums of money on the faith of
the bonds and of such other securities as it held for their
account. They failed in business on April 20, 1874, owing
the defendant $71,920.17, for checks certified by it and out-
standing, and for money paid by it up to the close of business
on April 18, 1874. On April 20, 1874, before the defendant
heard of such failure, it paid $210 more, making a total debt
of $72,130.17, which remained unpaid. No notice or claim as
to the ownership of the 93 bonds by the testator of the plain-
tiffs came to the defendant until May 5, 1874. The bonds
came into the possession of the defendant before it made the

certifications of checks for the account of Capron & Merriam, which were made on April 18, 1874; and the certifications were made on the faith of the deposit of the bonds and of the other securities which the defendant held for the account of Capron & Merriam.   The defendant used its best efforts to procure as large a price as possible for all the securities which had been pledged to it by Capron & Merriam, including the 93 bonds; but, after crediting to Capron & Merriam the entire proceeds of sales, there was a deficiency on their debt to the defendant of about $1800.   No payment on account of such deficiency, and no tender or offer of any kind in respect to said bonds, was ever made to the defendant by the testator of the, plaintiffs.   This action was not commenced until April 18, 1880, six years after the bonds came into the possession of the defendant.

At the trial, the plaintiffs asked the court to direct a verdict for them on the ground that the contract of certification of the checks by the defendant was void, because it was unlawful, being a certification of checks drawn by Capron & Merriam when they had no money on deposit to their credit with the defendant, and the defendant could not hold the 93 bonds as against such unlawful certification; and on the further ground that the defendant did not take the bonds in the ordinary course of business.

*Mr. Lewis Sanders* for plaintiffs in error.

I.   A national bank may not, through a contract condemned as unlawful by its organic law, acquire from the fraudulent lienors or bailees of negotiable instruments an indefeasible title thereto as against the true owner.

In *Felt* v. *Heye*, 24 How. (N. Y.) 361, the court held that the real owner of promissory notes which were unlawfully diverted by the pledgee, he placing them as collateral security to an usurious loan, could not attack the loan for usury, not being in privity with the borrower—the pledgee—the lender having no knowledge but that the borrower owned the collateral; but held also that the owner could recover, because an usurious, being an unlawful contract, the lender did not

acquire the promissory notes pledged as collateral in good faith in the ordinary course of business. See also *Clarke* v. *Shee*, 1 Cowp. 197; *Belmont Branch Bank* v. *Hoge*, 7 Bosworth (N. Y.) 543, 556; *Keutgen* v. *Parks*, 2 Sandf. Sup. Ct. (N. Y.) 60; *Bank* v. *Lanier*, 11 Wall. 369. A comparison of this case with the last case cited discloses that it is stronger against the bank than that case was: (1) In the Lanier case, at the time of the bank's loan to Culver, the stock was Culver's. In the case at bar, at the time of defendant's certifications of Capron & Merriam's checks, the bonds belonged to Mr. Thompson. (2) This action, like the Lanier case, does not seek to disturb the contracts made by the bank with either principals, Capron & Merriam, or the holders of the certified checks. Whatever liability Capron & Merriam had to the bank or the bank had to the holders of the checks, will not be affected by this action. (3) The defence in each case, a loan on stock and a loan by certifying checks, is a contract prohibited to the banks under the same penalty. (4) In each case the owner, unconnected with any transactions with the bank, is seeking his property or its value.

A contract of a corporation which is *ultra vires*, in the proper sense — that is to say, outside the object of its creation, as defined in the law of its organization, and, therefore, beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void and of no legal effect. *Central Transportation Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24, 59, 60; *Pennsylvania Railroad* v. *St. Louis Alton &c. Railroad*, 118 U. S. 240, 317; *Thomas* v. *Railroad Co.*, 101 U. S. 71, 86.

II. The defendant bank is not a holder for value. To be so it must have paid value to Capron & Merriam, from whom it received the bonds.

The bank's certifications of Capron & Merriam's checks being illegal, furnish no consideration for the bonds. The bank parted with no money at the time of the illegal certifying. The only transactions between the bank and Capron & Merriam were the unlawful certifications, and these can furnish no consideration unless an unlawful contract may be the basis for a lawful remedy.

III. These bonds were not transferred in the ordinary course of business or in good faith.

It is a solecism to say that a contract in express terms denounced by statute as "unlawful," is made in the ordinary course of business. However universal the violation of the statute may be by the national banks, daily forfeiting their charters, in a court of justice, administering the law, a contract in violation thereof cannot in law be said to have been made in the ordinary course of business, and if not made in the ordinary course of business, the negotiable quality of the securities did not pass to the bank, and it held them subject to the equities of the true owner. *Felt* v. *Heye,* 23 How. (N. Y.) 359, 361, 362; Daniel on Neg. Instrs. (2d ed.) § 769; *Roberts* v. *Hall,* 37 Connecticut, 205.

IV. Defendant took and claims to hold Mr. Thompson's bonds under a contract condemned by the law · this could not be in the ordinary course of business. The negotiable quality in such securities is an exception grafted upon the general law of property for the convenience of trade — lawful business — and is only available to promote that end. When the contract through which the title of the true owner is sought to be defeated is not of that character, the property has not, in fact, been negotiated, and the rights of the true owner are not affected by such transfer.

V. The defendant cited below the following authorities relating to national banks: *National Bank of Xenia* v. *Stewart,* 107 U. S. 676; *National Bank* v. *Matthews,* 98 U. S. 621; *Gold Mining Co.* v. *National Bank,* 96 U. S. 640; *National Bank* v. *Whitney,* 103 U. S. 99; *Reynolds* v. *Crawfordsville National Bank,* 112 U. S. 405; *Fortier* v. *New Orleans National Bank,* 112 U. S. 439. An examination of these cases will disclose: (1) That the actions were between the parties to the original contract, or their privies; (2) That the party receiving the consideration was, while retaining it, seeking to defeat the bank's recovery, under a penalty, or by the aid of the statute to set aside the contract and recover the collaterals pledged with the bank; (3) That in none of the cases were the rights of third parties involved; (4) That in

none of the cases was Rev. Stat. § 5208 involved ; (5) That in none of the cases was the contract condemned by the statute as " unlawful."

In the case at bar no question of forfeiture by the defendant is involved. The obligation of its contracts with Capron & Merriam is not involved: The *status quo* of parties in *pari delicto* is not disturbed; the party receiving the consideration is not availing himself of the statute as both sword and shield. No rescission of the contract is sought.

VI. The prohibition against national banks loaning on the security of their stock was enforced in *National Bank v. Lanier, supra.* See to the same point *Conklin* v. *Second National Bank of Oswego,* 45 N. Y. 655.

VII. The contracts with national banks which have been sustained by the United States Supreme Court have been, between the parties, executed and simply *ultra vires,* not prohibited.

In *National Bank* v. *Matthews,* 98 U. S. 621, brought to enjoin the foreclosure of a deed of trust assigned to the bank as collateral security for a note, the court decided: (1) that the deed of trust did not come within the letter or spirit of the prohibition; (2) the plaintiff sought the interposition of a court of equity, and was compelled to do equity; the same rule would have been applied to an agreement void for usury; (3) the party seeking to enjoin the foreclosure had received the benefit thereof.

In the case at bar Mr. Thompson was neither a party to nor a recipient of the benefit of the contracts of certification of Capron & Merriam's checks.

VIII. A contract made in violation of a statute is void, and it is immaterial that it is not so declared in the statute itself. The law adjudges it to be so, and courts do not undertake to pass upon the wisdom of the policy of the legislature in enacting prohibitory statutes; *Crocker* v. *Whitney,* 71 N. Y. 161, 170; *Pennington* v. *Townsend,* 7 Wend. 276; *Bank of the United States* v. *Owens,* 2 Pet. 527; *Hallett* v. *Novion,* 14 Johns. 273; *Barton* v. *Port Jackson &c. Plank Road Co.,* 17 Barb. 397.

*Mr. William Allen Butler* (with whom was *Mr. John A Taylor* on the brief) for defendant in error.

Mr. Justice Blatchford, after stating the case as above reported, delivered the opinion of the court.

The Federal question involved is the only one which we can consider on this writ of error. It arises under the act of March 3, 1869, 15 Stat. 335, c. 135, which was the statute in force on April 18, 1874, and read as follows: "It shall be unlawful for any officer, clerk or agent of any national bank to certify any check drawn upon said bank, unless the person or company drawing said check shall have on deposit in said bank, at the time such check is certified, an amount of money equal to the amount specified in such check; and any check so certified by duly authorized officers shall be a good and valid obligation against such bank; and any officer, clerk or agent of any national bank violating the provisions of this act shall subject such bank to the liabilities and proceedings on the part of the comptroller, as provided for in section fifty of the national banking law, approved June third, eighteen hundred and sixty-four." 13 Stat. 114, c. 106. The provisions of that § 50 were that the comptroller of the currency might forthwith appoint a receiver to wind up the affairs of the banking association. The provisions of the act of March 3, 1869, are now embodied in § 5208 of the Revised Statutes.

In regard to the Federal question involved, namely, the certification of checks by the defendant for Capron & Merriam without having on deposit an equivalent amount of money to meet them, and the contention that the defendant did not become a *bonâ fide* holder of the bonds in virtue of payments made in pursuance of the agreement with that firm, the Court of Appeals remarked, in its opinion, given by Ruger, C. J., that the statute of the United States affirmed the validity of the contract of certification, and expressly provided the consequences which should follow its violation; that the penalty incurred was impliedly limited to a forfeiture of the bank's charter and the winding up of its affairs; that it was thus

clearly implied that no other consequences were intended to follow a violation of the statute; and that it would defeat the very policy of an act intended to promote the security and strength of the national banking system, if its provisions should be so construed as to inflict a loss upon the banks and a consequent impairment of their financial responsibility. The court then cited, to support that view, *National Bank* v. *Matthews*, 98 U. S. 621, *National Bank* v. *Whitney*, 103 U. S. 99, and *National Bank of Xenia* v. *Stewart*, 107 U. S. 676.

The Court of Appeals further said that it was of opinion that the statute in question had no application to the question involved in this suit, which concerned only the relations between Capron & Merriam and the defendant; that, by the deposit of the bonds, the former secured the promise of the defendant to protect their checks of a certain day for a specified amount; that the certification of the checks was entirely aside from the agreement between Capron & Merriam and the defendant, and was a contract between the defendant and the anticipated holders of the checks; that Capron & Merriam had received the consideration of their pledge, when the defendant agreed with them to honor their checks, and that would have been equally effectual, between the parties, without any certification; that the certification was simply a promise to such persons as might receive the checks that they should be paid on presentation to the defendant, in accordance with its previous agreement with Capron & Merriam; that the legal effect of the agreement was that the defendant should loan a certain amount to Capron & Merriam, and would pay it out on their checks to the persons holding such checks; that it was entirely legal for the defendant to contract to pay Capron & Merriam's checks, and it did not affect the legality of that transaction that the defendant also represented to third parties that it had made such an agreement and would pay such checks; that Capron & Merriam could not dispute their liability for the amount paid out in pursuance of such agreement, nor could any other party, standing in the shoes of Capron & Merriam; that the fact that the defendant, in connection with the agreement to

pay such checks, had also promised third parties to pay them, could not invalidate the liability previously incurred, or impair the security which had previously been given to the defendant upon a valid consideration; that the fact of the certification was entirely immaterial in respect to the liability incurred by Capron & Merriam to the defendant; that there was no evidence impairing the title to the bonds acquired by the defendant through the transfer of them to it by Capron & Merriam; that the purpose for which the bonds were transferred by the testator of the plaintiffs to Capron & Merriam contemplated their transfer and sale by the latter to third persons; that the defendant acquired a valid title to them by their transfer to it; that the transaction between Capron & Merriam and the defendant was in the ordinary course of business pursued by the latter; that it received the bonds in good faith, for a valuable consideration, and within all the authorities this gave it a good title to the bonds; that it was authorized to deal with them for the purpose of effecting the object for which they were transferred to it; that its right to hold the bonds continued so long as any part of its debt against Capron & Merriam remained unpaid; that the testator of the plaintiffs could at any time have established his equitable right to a return of the bonds, and could have procured their surrender, by paying the amount for which they were pledged, but he refrained from doing so, and impliedly denied any right in the defendant by demanding the unconditional surrender of the bonds; and that he never became entitled to such surrender, and of course was not authorized to recover possession of them. We regard those views as sound, and as covering this case.

The agreement of December 2, 1873, between Capron & Merriam and the defendant, did not call for any act violating the statute. There was nothing illegal in providing that the securities which the bank might hold to secure the debt to it of Capron & Merriam should be available to make good such debt. The statute does not declare void a contract to secure a debt arising on the certifications which it prohibits.

In addition to that, the statute expressly provides that a

check certified by a duly authorized officer of the bank, when the customer has not on deposit an amount of money equal to the amount specified in the check certified, shall nevertheless be a good and valid obligation against the bank; and there is nothing in the statute which, expressly or by implication, prohibits the bank from taking security for the protection of its stockholders against the debt thus created. There is no prohibition against a contract by the bank for security for a debt which the statute contemplates as likely to come into existence, although the unlawful act of the officer of the bank in certifying may aid in creating the debt. In order to adjudge a contract unlawful, as prohibited by a statute, the prohibition must be found in the statute. The subjection of the bank to the penalty prescribed by the statute for its violation cannot operate to destroy the security for the debt created by the forbidden certification.

If the testator of the plaintiffs had pledged the bonds to the defendant, he could not, after receiving the defendant's money, have replevied the bonds; and after possession of the bonds had been given by him to Capron & Merriam, and after they had been subsequently taken by the defendant in good faith, neither he nor his executors can set up the statute to destroy the debt.

This construction of the statute in question is strengthened by the subsequent enactment, on July 12, 1882, of § 13 of the act of that date, c. 288, 22 Stat. 166, making it a criminal offence in an officer, clerk or agent of a national bank to violate the provisions of the act of March 3, 1869. This shows that Congress only intended to impose, as penalties for over-certifying checks, a forfeiture of the franchises of the bank and a punishment of the delinquent officer or clerk, and did not intend to invalidate commercial transactions connected with forbidden certifications. As the defendant was bound to make good the checks to the holders of them, because the act of 1869 declares that the checks shall be good and valid obligations against the defendant, it follows that Capron & Merriam were bound to make good the amounts to the defendant It necessarily results that the defendant, on paying the checks,

was as much entitled to resort to the securities which Capron & Merriam had put into its hands, as it would have been to apply money which they might have deposited to meet the checks.

Moreover, it has been held repeatedly by this court that where the provisions of the national banking act prohibit certain acts by banks or their officers, without imposing any penalty or forfeiture applicable to particular transactions which have been executed, their validity can be questioned only by the United States, and not by private parties. *National Bank* v. *Matthews*, 98 U. S. 621; *National Bank* v. *Whitney*, 103 U. S. 99; *National Bank of Xenia* v. *Stewart*, 107 U. S. 676.

The bonds in question came into the possession of the defendant before it certified the checks. They were not pledged to it under any agreement or knowledge on its part, or in fact on the part of Capron & Merriam, that subsequent certifications would be made. The certifications were made after the pledge, and created a debt of Capron & Merriam to the defendant, which arose after the pledge. The agreement of December 2, 1873, applied and became operative simultaneously with the certifications, but independently of them, as a legal proposition.

In *Logan County Bank* v. *Townsend*, 139 U. S. 67, 77, decided in March, 1891, after the present case was decided by the Court of Appeals of New York, this court approved the decision in *National Bank* v. *Whitney*, 103 U. S. 99, and said that a disregard by a national bank of the provisions of the act of Congress forbidding it to take a mortgage to secure an indebtedness then existing, as well as future advances, could not be taken advantage of by the debtor, but "only laid the institution open to proceedings by the government for exercising powers not conferred by law."

*Judgment affirmed.*