THE BUFFALO GERMAN INSURANCE COMPANY, Appellant, *v.* THIRD NATIONAL BANK of Buffalo, Respondent.

*Stock in a bank — pledged as collateral for a loan — effect of a certificate of bank stock which states that the bank has a lien thereon for all indebtedness to it — effect of its non-delivery to the bank.*

A provision incorporated into a certificate of stock of a national bank stating that "no transfer of the stock of this association shall be made without the consent of the board of directors by any stockholder who shall be liable to the association, either as principal debtor or otherwise, which liability shall be a lien upon the said stock and all profits thereof and dividends," is effective to create a lien in favor of the bank, as against a party to whom an instrument of assignment of the stock has been duly executed by the owner thereof, to secure an indebtedness, created at the time and in consideration thereof, in favor of the assignee.

This is so notwithstanding the fact that the provisions of the National Banking Act prohibit a bank from making any loan or discount on the security of the shares of its own capital stock, except to prevent a loss upon a debt previously contracted in good faith.

Such an assignee is not entitled to have the stock so assigned to him transferred upon the books of the company until he has paid the amount of the indebtedness of his assignor to the bank.

Such lien is not affected by the fact that no actual delivery of the stock was made to the bank, the contract in question differing from ordinary lien contracts, in that the stock was sold and the certificate thereof was delivered upon the distinct agreement, expressed in unequivocal language, that the stock was subject to a lien for any indebtedness of the holder, and was not transferable upon the books of the bank until such indebtedness was canceled.

APPEAL by the plaintiff, The Buffalo German Insurance Company, from so much of a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Erie on the 23d day of February, 1897, upon the decision of the court, rendered after a trial at the Erie Special Term, as orders and adjudges that the plaintiff is entitled to a transfer of the stock therein mentioned, on the books of the defendant, subject to the right of the defendant to a lien thereon for the amount of the indebtedness existing in favor of the defendant against the estate of Emanuel Levi, when the certificates in question sold to and purchased by the plaintiff shall be duly tendered for surrender and cancellation, and the amount of its said lien shall be tendered to said defendant; and from so much of said judgment as further orders and adjudges that the plaintiff's complaint be dismissed upon the merits, upon the sole ground that the plaintiff is entitled to a trans-

fer of the stock in question by the defendant, and to have new certificates issued to it in place of those to be surrendered and canceled, when, but not until, it shall pay or tender to defendant an amount of money sufficient to satisfy and discharge the lien of defendant upon the said stock; and from so much of said judgment as further orders and adjudges that the defendant recover of the plaintiff the sum of $557.08, costs and disbursements.

The plaintiff, a domestic corporation created under the laws of this State, brings this action to compel the defendant to transfer to the plaintiff upon the books of the former 450 shares of its capital stock of which the plaintiff claims to be the owner.

This stock, the par value of which is $100 per share, was originally owned by one Emanuel Levi, and was pledged by him to the plaintiff as collateral security for several loans of money amounting in the aggregate to $55,000. The original certificates of stock issued by the defendant to Levi were all in the following form, viz. :

" Number.                                              Shares.
" STATE OF NEW YORK,
" THIRD NATIONAL BANK OF BUFFALO.

" THIS is to certify that Emanuel Levi is the owner of .... shares of one hundred dollars each of the capital stock of the Third National Bank of Buffalo, subject to the lien or liens referred to in section 15 of the by-laws of said bank in the following words:

" ' No transfer of the stock of this association shall be made without the consent of the board of directors by any stockholder who shall be liable to the association, either as principal debtor or otherwise, which liability shall be a lien upon the said stock and all profits thereof and dividends.' And that the said stock is transferable only upon the books of the bank by him or his attorney on the surrender and cancellation of this certificate and compliance with said by-law.

" Dated at BUFFALO, NEW YORK, this .... day of ...... .. 18...
" CHARLES A. SWEET, *President.*
" N. ROCHESTER, *Cashier.*"

Upon each occasion when this stock was hypothecated to the plaintiff for the purpose above stated, Levi executed and delivered to it an assignment thereof in writing of which the following is a copy, viz. :

"*Know all men by these presents*, That I, Emanuel Levi, for value received, have bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer unto the Buffalo German Insurance Company . . . . . . . . shares of the capital stock of the Third National Bank of Buffalo, being certificates . . . . . . . . standing in my name on the books of the Third National Bank. I do hereby constitute and appoint John P. Diehl, Chairman of the Finance Committee of the Buffalo German Insurance Company, my true and lawful attorney, irrevocable for me and in my name and stead, but to use, to sell, assign, transfer and set over all or any part of the said stock, and for that purpose to make and execute all necessary acts of assignment and transfer, and one or more persons to substitute with like full power, hereby ratifying and confirming all that the said attorney, or his substitute or substitutes, shall lawfully do by virtue hereof.

"*In witness whereof*, I have hereunto set my hand and seal the third day of December, 1890.

"EMANUEL LEVI.  [L. S.]"

And accompanying such assignments he also executed and delivered to the plaintiff his written receipt in form and substance as follows, viz. :

"*Received*, Buffalo, December 3rd, 1890, of the Buffalo German Insurance Company of Buffalo, N. Y., . . . . . . . . . . thousand dollars under an account opened by me with said company, to be returned on call, with interest at the rate of six per cent per annum ; and as collateral security for the payment thereof I have assigned to said company, . . . . . . . . . .    *    *    *

"In case I shall refuse or neglect to pay the said principal and interest on call, I do hereby authorize the said company to sell the said securities at public or private sale on notice of five days by letter mailed to my address at Buffalo, N. Y. And from the proceeds thereof, after deducting all costs and expenses, to satisfy the said principal and interest, rendering the surplus, if any, to the undersigned.

"EMANUEL LEVI."

Thereafter, and prior to the commencement of this action and the demand and notice hereinafter mentioned, Levi died, leaving a last

will and testament by which he appointed Rosa Levi and Louis E. Levi his executors, who subsequently qualified as such.

The interest upon the notes given to the plaintiff, with the exception of about $300, was paid as it matured, leaving due thereon upon the 1st day of January, 1896, $55,300 of principal and interest. On the ninth day of June, following, the plaintiff made a written demand upon the executors above named for the payment of the notes which it held, and notified them that in the event the same were not paid and the stock redeemed on or before the sixteenth day of that month, such stock would be sold and the proceeds applied in liquidation of the indebtedness of their testator. No attention being given to this demand, the plaintiff caused a written notice of sale to be served upon the executors, and also caused copies thereof to be posted in three separate places in the city of Buffalo, and thereafter, and on the 30th day of June, 1896, the stock was sold at public sale and was bid in by the plaintiff for the sum of $44,000.

The defendant was represented at the sale by its attorney, as were also the executors, one of the latter being present in person. Thereafter the plaintiff duly demanded of the defendant that the stock so purchased be transferred upon the latter's books, which demand was refused upon the ground that the defendant had a lien thereon prior to that of the plaintiff.

Emanuel Levi was, it appears, a director of the defendant bank, and at the time he hypothecated his stock to the plaintiff he was indebted to the bank for borrowed money in the sum of about $15,000, of which sum $9,000 was secured by indorsements and collaterals, and the balance, $6,400, was unsecured, except by his stock, which, upon the 1st day of October, 1890, he verbally agreed with the defendant's president to pledge as security for an increase of his loans. At this time the certificates were in a safe deposit vault, and they were never in fact delivered to the defendant, but it was stipulated that they might be regarded as collateral to the loan. The dividends upon this stock were paid by the defendant to Levi or his executors until the sale by the plaintiff in June, 1896, after which time they were applied in reduction of the defendant's claim.

*Arthur W. Hickman* and *Theodore Bacon*, for the appellant.

*Adelbert Moot*, for the respondent.

ADAMS, J. :

There is little, if any, dispute respecting the facts of this case which are epitomized in the foregoing recital, and while counsel, both upon the oral argument and in their briefs, have discussed with some degree of elaboration several minor issues which possess more or less relevancy to the main contention, we are convinced that these issues are quite subordinate in their character, and that there is really but one question in the case which demands our serious consideration. This question involves the effect to be given to the lien clause incorporated into the defendant's certificates of stock; and its determination, whatsoever it may be, is, in our opinion, necessarily decisive of the conflicting claims of the parties to the subject-matter of the controversy. For if this clause is absolutely void, as against subsequent purchasers or lienors, it follows, of course, that the plaintiff's contention is well founded; whereas, if, as to the plaintiff, the clause may be regarded as valid, it is equally obvious that the defendant's right to the stock in question is paramount to that of the plaintiff. This proposition, however, it is proper to state, is founded, to some extent at least, upon the assumption that the plaintiff can in no aspect of the case be regarded as a *bona fide* transferee of the stock.

It is an undoubted fact that bank stock certificates, while not possessing all the characteristics of commercial paper, are nevertheless esteemed by the business world as having a value somewhat superior to ordinary securities. For this reason they have come to be regarded as one of the most desirable bases of commercial transactions, and when· transferred to a purchaser for value and without notice of any defect in title, the certificate is of itself generally an assurance to the transferee that, upon its presentation, the holder will be entitled to have the stock transferred to him upon the books of the bank. (*Bank* v. *Lanier*, 78 U. S. 369; *Driscoll* v. *West Bradley & Carey Mfg. Co.*, 59 N. Y. 96, 105.) But in this instance, as we have seen, the certificates were not in the usual form, for they contained what was equivalent to an announcement to the whole world that the stock which they represented was subject to a possible lien in favor of the corporation issuing the same, and that such stock would not be transferred upon the books of the corporation until that lien was satisfied. Consequently, when the certificates in question came

into the plaintiff's possession, it was with full notice of the defendant's rights, whatever they might be; and, therefore, the plaintiff took the same subject to whatever equities existed against the title of the pledgor. In other words, it now occupies precisely the same relation towards this defendant as would its pledgor if he were seeking to recover damages for the conversion of so much of his stock as had been sold by the bank to satisfy its lien for borrowed money. (*Porter* v. *Parks*, 49 N. Y. 564; *Williamson* v. *Brown*, 15 id. 354; *Fowle* v. *Ward*, 113 Mass. 548.)

We come then to the consideration of the one vital question to which we have already adverted, which is: What, if any, right or interest did the defendant retain in the 450 shares of its capital stock which the nominal owner, Emanuel Levi, assumed to assign to the plaintiff?

The defendant was organized under the National Banking Law of 1864 (13 U. S. Stat. at Large, 99), which was a substitute for a similar law enacted by the Congress of the United States in 1863. The 36th section of the earlier statute declared that " * * * no shareholder in any association under this act shall have power to sell or transfer any share held in his own right so long as he shall be liable, either as principal, debtor, surety or otherwise, to the association for any debt which shall have become due and remain unpaid. * * * " (12 U. S. Stat. at Large, 675.)

This section was, however, omitted from, and expressly repealed by, the act of 1864. And such repeal must be regarded as the "manifestation of a purpose to withhold from banking associations a lien upon the stock of their debtors," and a notification to the directors of such associations "that thereafter they must deal with their shareholders as they dealt with other people." (*Bullard* v. *Bank*, 18 Wall. 594.)

It is apparent, then, that the policy of the amended act was to prohibit and prevent liens in favor of national banks upon the stock of their debtors; and although this same act authorizes such associations to enact by-laws for the regulation of their business and the management of their property, such by-laws are required to be consistent with the provisions of the act, and it is, therefore, quite certain that the defendant could not accomplish, by indirection, that which was prohibited by the law to which it owes its existence.

But the act of 1864 not only repealed section 36 of the earlier act; it also contained a provision that no association organized thereunder should make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith. (13 U. S. Stat. at Large, 110, § 35.)

We have here, then, an express inhibition against doing the very act which lies at the foundation of the defendant's contention. For it is established, beyond all controversy, that whatever lien it has, or claims upon, the stock in question was created by way of security for a present or future loan of money, and not for a past indebtedness; and it would seem that with this much determined, the question which is presented for our consideration ought not to be difficult of solution; for, although the inhibitory statute, to which reference has just been made, imposes no penalty for its violation, the principle of law is well settled in this State that the courts will not enforce nor sustain a contract, the subject-matter of which is *malum prohibitum* (*Crocker* v. *Whitney*, 71 N. Y. 161); and the defendant's contract is undeniably of that nature. (*Conklin* v. *The Second Nat. Bank*, 45 N. Y. 655; *Crocker* v. *Whitney, supra; Nicollet Nat. Bank* v. *City Bank*, 38 Minn. 85.)

But this is a case which, as has been stated, involves questions arising under a Federal law, respecting a corporation created by its authority, and in giving construction to that law the rulings of the Federal courts must be regarded as controlling. (*Duncomb* v. *N. Y., H. & N. R. R. Co.*, 84 N. Y. 191.)

It becomes important, therefore, to ascertain from the source indicated, if possible, what effect the violation of this statute will have upon the defendant's contract of lien, which, but for the statute above cited, would unquestionably be perfectly valid and equitable.

By the terms of section 5137 of the Revised Statutes of the United States, a national banking association is impliedly, if not expressly, prohibited from loaning money upon real estate security, and, as in the present case, no penalty is denounced for the violation of that statute.

In the case of *National Bank* v. *Matthews* (98 U. S. 621) the plaintiff took, by assignment, a note which was secured by a deed of

trust which was likewise assigned to the plaintiff, and, the note not being paid at maturity, proceedings were instituted to sell the premises described in the trust deed. The grantor thereupon filed a bill to enjoin the sale upon the ground that, by sections 5136 and 5137 of the Revised Statutes, the deed did not inure as a security for the loan made by the bank at the time of the assignment of the note and deed. It was held that the deed was, in effect, a mortgage, but that the bank was entitled to enforce its claim for the reason that a judgment of ouster and dissolution was the only check contemplated by Congress in prohibiting the taking of such security, and that such a judgment was available to the government only, and not to an individual.

The doctrine thus enunciated was subsequently reiterated by the Supreme Court of the United States in a case where a national bank had, in open violation of the statute, taken a mortgage upon real estate as security for past and future indebtedness, in which case it was expressly held that a disregard of the prohibitory clause of the Banking Law did not vitiate the real estate securities taken for loans, but only laid the association taking them open to proceedings by the government. (*National Bank* v. *Whitney*, 103 U. S. 99, revg. S. C., *sub nom. Crocker* v. *Whitney*, 71 N. Y. 161.)

Still later the precise question now under consideration came up for adjudication in the same court, in a case where a stockholder in a national bank borrowed money of the bank and pledged his stock as security therefor; failing to pay the debt at its maturity, the bank sold his stock and applied the proceeds upon the borrower's indebtedness, who thereupon brought an action to recover the same upon the ground that the bank was prohibited, by statute, from loaning money " upon the security of shares of its own stock."

The trial court charged the jury that " if they found, from the evidence, that the stock was delivered by him (the borrower) to the bank as a pledge or collateral security for a present loan of money made to him by the bank at the time of such delivery, the plaintiffs (who were the administrators of the borrower) were entitled to recover the amount of the proceeds, with interest from the time of sale, as the defendant was prohibited by the Currency Act from thus receiving its own stock."

This charge was excepted to, and, upon a review of the judgment

entered upon a verdict in favor of the plaintiffs, a new trial was granted, the Supreme Court, in its opinion, making use of the following language, viz.: "While this section (35 of 13 U. S. Stat. at Large, 110, or § 5201 of the U. S. R. S.), in terms, prohibits a banking association from making a loan upon the security of shares of its own stock, it imposes no penalty, either upon the bank or borrower, if a loan upon such security be made. If, therefore, the prohibition can be urged against the validity of the transaction by any one except the government, it can only be done before the contract is executed, while the security is still subsisting in the hands of the bank. It can then, if at all, be invoked to restrain or defeat the enforcement of the security. When the contract has been executed, the security sold and the proceeds applied to the payment of the debt, the courts will not interfere with the matter. Both bank and borrower are, in such case, equally the subjects of legal censure, and they will be left by the courts where they have placed themselves." (*Nat. Bank of Zenia* v. *Stewart*, 107 U. S. 677.)

Thus it will be seen that, while grave doubt is expressed whether the prohibition in the statute can, at any time, be urged against the validity of the transaction by any one except the government, it is asserted that it certainly cannot be after the contract has been executed, the security sold and the proceeds applied to the payment of the debt for which it was pledged.

In this case the bank had applied the dividends declared upon the stock in question for the years 1896 and 1897 in liquidation of the pledgor's indebtedness, and if obliged to surrender the stock itself the loss, if any, would, of course, fall upon the stockholders. As was said in the case of *Bank* v. *Matthews* (*supra*) it cannot be that it was intended by Congress "that stockholders, and perhaps depositors and other creditors, should be punished and the borrower rewarded by giving success to this defense whenever the offensive fact shall occur."

The reports contain many other cases where the same principle for which the defendant is contending has been applied. In the case of *Fleckner* v. *Bank of U. S.* (8 Wheat. 339) it was held that the taking of usury could not be set up by way of defense to a note on which it was taken, inasmuch as the statute incorporating the

bank did not declare such securities void; that it was merely a violation of the bank's charter for which a remedy may be applied by the government.

In another case, where a defendant sued by a national bank for moneys which it had loaned him set up as a bar that such loan exceeded in amount one-tenth part of the bank's capital stock actually paid in, it was held that such a defense was not available; that when a statute prohibits an act, and even when it annexes a penalty for its commission, it does not follow that the unlawfulness of the act was meant to avoid a contract made in contravention of it. (*Gold Mining Co.* v. *Nat. Bank*, 96 U. S. 640.)

And in a comparatively recent case it was said, in the course of the opinion of the court, that "it has been held repeatedly by this court that where the provisions of the National Banking Act prohibit certain acts by banks or their officers, without imposing any penalty or forfeiture applicable to particular transactions which have been executed, their validity can be questioned only by the United States and not by private parties." (*Thompson* v. *St. Nicholas Nat. Bank*, 146 U. S. 240, 251.)

This was a case where the defendant had unlawfully certified checks drawn upon it in violation of section 5208 of the United States Revised Statutes, and it was held that the checks thus certified were good and valid obligations against the bank.

It is not to be denied that there are several authorities which seem to support the converse of the proposition which these cases establish. We have already cited two which expressly declare that contracts made in violation of the provisions of the National Banking Law cannot be enforced, but one of these (*Crocker* v. *Whitney*, *supra*), as has already been stated, was reversed by the Supreme Court of the United States, and the other (*Conklin* v. *Bank*, *supra*) we do not feel at liberty to follow in view of the decisions to the contrary by the ultimate tribunal whose jurisdiction of these questions is such as to invest its adjudications with the quality of *stare decisis*. It remains only to consider one or two other authorities upon which great reliance is apparently placed by the plaintiff by reason of the fact that they are also decisions of the Supreme Court of the United States.

The case of *Bank* v. *Lanier* (11 Wall. 369) was one where the

plaintiff in error assumed that it had a lien upon certain stock for an indebtedness of the stockholder, *without having made any special agreement on the subject*, by virtue of the provisions of section 36 of the Currency Act of 1863, and of a by-law of the bank enacted when this section was in force; and it was held that when the restrictions of section 36 fell, the by-law fell with them and the bank became subject to the provisions of the act of 1864. The principal question, however, which that case decides is, that a bank whose certificates declare the stockholder entitled to so many shares ·of stock which can be transferred on the books of the corporation in person or by attorney, when the certificates are surrendered, but not otherwise, and which suffers a stockholder to transfer to anybody on the books of the bank his stock, without producing and surrendering his certificates thereof, is liable to a *bona fide* transferee for value, of the same stock, who produces the certificates with a properly executed power of attorney to transfer, and this although no notice had been given to the bank of the latter transfer.

In the case of *Bullard* v. *Bank* (18 Wall. 589) the defendant was organized in 1865; its articles of association referred to the act ·of 1864 and then provided that the directors should "have the power to make all by-laws that it may be proper and convenient for them to make under said act, for the general regulation of the business of the association and the entire management and administration of its affairs, which by-laws may prohibit, if the directors so determine, the transfer of stock owned by any stockholder who may be liable to the association either as principal debtor or otherwise, without the consent of the board."

Subsequently a by-law was adopted by the directors which declared that, " All debts actually due and payable to the bank (days of grace for payment being passed) by a stockholder, as principal debtor or otherwise, requesting a transfer, must be satisfied before such transfer shall be made unless the board of directors shall direct to the contrary."

And thereafter this by-law was amended by adding thereto the ·words following: " And no person indebted to the bank shall be .allowed to sell or transfer his or her stock without the consent of a majority of the directors, and this whether liable as principal or .surety, and whether the debt or liability be due or not."

It was held that this by-law was not "a regulation of the business of the bank or a regulation for the conduct of its affairs," within the meaning of the National Banking Act of 1864, and, therefore, such a regulation as under the act national banks had a right to make; and consequently that it furnished no authority to the bank by which it could acquire a lien on its own stock held by persons who were its debtors.

We do not regard these cases as conflicting in principle with those heretofore cited, but if we are wrong in our interpretation of them, the more recent decisions certainly establish the doctrine most unequivocally that a contract made in contravention of any provision of the National Banking Act is not, in the absence of any declaration to that effect in the act itself, void or incapable of enforcement, and this being so we feel constrained to apply that doctrine to the present case.

Some point is made by the plaintiff of the fact that the Levi certificates were never actually delivered to the defendant. This is unquestionably so, and it is likewise true that, as a general rule, personal property when pledged for the payment of a debt should pass into the possession and remain under the control of the pledgee. (18 Am. & Eng. Ency. of Law, 595, 598 ; *Black* v. *Bogert,* 65 N. Y. 601.)

The contract in this case, however, differs in one essential respect from ordinary lien contracts in that the stock was sold, and the certificates thereof were delivered to the purchaser upon the distinct agreement, expressed in unequivocal language, that the stock was subject to a lien for any indebtedness of the holder and was not transferable upon the books of the bank until such indebtedness was canceled. In these circumstances we are of the opinion that it became unnecessary for the bank to retain the certificates.

Our conclusion of the whole matter is that the case was properly disposed of at the Trial Term and that the decision there rendered should, therefore, be sustained.

All concurred, except HARDIN, P. J., and FOLLETT, J., dissenting.

That portion of the judgment appealed from affirmed, with costs.