CORTEZ OIL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22233.   Promulgated August 4, 1930.

*Lyle Alverson, Esq.*, and *Wayne Johnson, Esq.*, for the petitioner. *Harry LeRoy Jones, Esq.*, for the respondent.

464

466

OPINION.

PHILLIPS: Petitioner contends that Alvarado and Balboa were affiliated with it during the period January 1, 1919, to August 24, 1919, within the meaning of section 240 (b) of the Revenue Act of 1918, which provides:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

The first provision is inapplicable, since none of these corporations owned or controlled any part of the stock of the others. Assuming that Meyer and the King family constituted the "same interests," it appears that these interests owned but 48 per cent of the stock of petitioner, while Indiahoma, which held 52 per cent, owned no stock in Balboa, and, therefore, petitioner and Balboa were not affiliated unless the stock held by Indiahoma was controlled by the minority and should be wholly disregarded.

With respect to the stock held by Indiahoma, petitioner makes several contentions. It is alleged in the petition that Indiahoma was prohibited by the Constitution of Oklahoma from voting its stock in petitioner and in Alvarado and, further, that the stock owned by Indiahoma was at all times voted in accordance with the wishes of Hugh King Jr., pursuant to an agreement whereby King substantially controlled said stock.

Petitioner's contention that the stock held by Indiahoma was non-voting stock, or, as termed by petitioner's counsel, "non-effective

stock," rests upon the provisions of section 41 of article 9 of the Constitution of Oklahoma, the pertinent parts of which read:

No corporation chartered or licensed to do business in this State shall own, hold, or control, in any manner whatever, the stock of any competitive corporation or corporations engaged in the same kind of business, in or out of the State, except such stock as may be pledged in good faith to secure bona fide indebtedness acquired upon foreclosure, execution sale, or otherwise for the satisfaction of debt. In all cases where any corporation acquires stock in any other corporation, as herein provided, it shall be required to dispose of the same within twelve months from the date of acquisition; and during the period of its ownership of such stock, it shall have no right to participate in the control of such corporation, except when permitted by order of the Corporation Commission.

Petitioner asserts that by the above provisions Indiahoma was prohibited from voting the stock held by it, with the result that all the voting stock was held by Meyer and the King family. It relies upon *Schlafly* v. *United States*, 4 Fed. (2d) 195, where it was held that nonvoting preferred stock should be disregarded in a case where all the voting stock was owned by another corporation. Unless the stock held by Indiahoma was destroyed by the constitutional provision, the most that can be said of petitioner's contention is that the right to vote such stock was suspended during the time it was so owned. The same would be equally true of stock owned by an incompetent during the period he had no guardian. It would be an extremely broad construction of section 240 (b) to apply the rule laid down in the *Schlafly* case to a situation where the same interests owned only a minority of the voting stock and where the right to vote the majority was temporarily suspended during the period of a certain ownership. Whatever may be the answer, the case presented by the record goes far beyond that question.

Here it is alleged in the petition and admitted in the answer that Indiahoma owned this stock during the period in question and for several years prior thereto. This was no temporary ownership. Not only was this stock owned by Indiahoma; it was voted. On August 24, 1919, this stock was purchased by the minority at a price far in excess of its par value.

The Constitution of Oklahoma does not declare such ownership and voting void. It imposes neither forfeiture nor penalty. No legislation has been enacted to carry it into effect. It lays down a rule of public policy and not of property. Only the State could question the validity of the transaction. *Groves* v. *Slaughter*, 15 Pet. 449; *National Bank* v. *Matthews*, 98 U. S. 621; *Whitney* v. *Wyman*, 101 U. S. 392; *National Bank* v. *Whitney*, 103 U. S. 99; *National Bank of Xenia* v. *Stewart*, 107 U. S. 676; *St. Louis Railroad* v. *Terre Haute Railroad*, 145 U. S. 393; *Thompson* v. *Saint Nicholas*

*National Bank*, 146 U. S. 240; *Scott* v. *Deweese*, 181 U. S. 202; *Kerfoot* v. *Farmers' & Merchants' Bank*, 218 U. S. 281.

Tax matters are controlled by what actually took place and not by what might have occurred. Petitioner or its officers might have taken steps through the proper public officials to require Indiahoma to sell its stock or to stop it from voting, but neither was done. Unquestionably a majority of petitioner's stock was owned by Indiahoma and it was in fact voted and upon its vote is based the entire superstructure of corporate affairs. The legal and practical situations are such that we must hold that in determining the question of affiliation the stock owned by Indiahoma must be treated as any other stock.

The next question is whether Meyer and the King family controlled the voting of the stock held by Indiahoma. The only witness introduced on this issue was Hugh King, Jr., who, after stating that he had been advised that Indiahoma could not legally vote its stock, testified:

Q. In view of the fact that you had such advice, and that they purported to represent the Indiahoma, why were they listed as voters at this meeting and recognized as such?

A. Well, from the beginning, when they bought the stock, up to and including this time, we had always gotten along with them very well. We had a distinct understanding with them, in the first place, that they would not interfere at all in the management of the company. They put in my brother as general manager. They raised my salary from $2,000 to $7,500; and all of the time we did business with them, we never had any criticism about the work, but on the other hand they complimented us very highly. We had absolutely no reason to believe that they would oppose our wishes, because they continued to pat us on the back; and since I saw no reason why we should stop them from voting, I let them vote, that is all.

Q. Did you have any reason to believe that they were going to vote with you?

A. Oh yes, they told us beforehand that everything was all right; they approved of the management of the company.

Q. And under those circumstances, didn't you object to their voting; why didn't you object to their voting?

A. Why should I? They weren't opposing us.

Q. Well, would your attitude have been any different if you had reason to believe that they were going to oppose you?

A. Oh yes, I would have stopped it.

In this testimony appears the gratitude of a minority stockholder to the majority for favors conferred upon him and upon his brother coupled with the threat that if Indiahoma had opposed his wishes, King would have prevented the voting of its stock. There is a flat statement of an understanding that Indiahoma should not interfere in the management followed immediately by statements so phrased as to unmistakably disclose that, in some respects at least, India-

homa took an important part in the management. The testimony, while indicating the acquiescence on the part of Indiahoma in the management of petitioner, also indicates that it suggested and carried into effect certain policies. It did not entrust the voting of its stock to King, but had its own officer present at stockholders' meetings to represent it. Under these circumstances we are not impressed with the thought that King controlled the stock owned by Indiahoma.

It is urged that the King family and Meyer were "the same interests," within the meaning of section 240 (b), *supra.* Assuming without deciding that this is so, we have stock owned or controlled as follows:

|  | Petitioner | Alvarado | Balboa |
|---|---|---|---|
|  | *Per cent* | *Per cent* | *Per cent* |
| King family and Meyer | 48 | 66.7 | 100 |
| Indiahoma Refining Co | 52 | 33.3 | 0 |

Petitioner does not contend that the King family and Meyer are "the same interests" as Indiahoma Refining Co., nor is there anything in the record which suggests that they are. The case made by petitioner rests upon either eliminating the stock of Indiahoma Refining Co., because of the constitutional provision, or showing control of that stock to have been in King. These points having been decided adversely to petitioner, the action of Commissioner in denying affiliation is approved.

Upon authority of the decision in *L. S. Ayers & Co.,* 1 B. T. A. 1135, we hold that respondent erred in reducing the amount of current earnings available for dividends by the amount of a tentative tax for the current year.

*Decision will be entered under Rule 50.*