MT. VERNON REFRIGERATING CO. v. FRED W. WOLF CO.

(Circuit Court of Appeals, Sixth Circuit.   June 6, 1911.)

No. 2,086.

1. APPEAL AND ERROR (§ 1009*)—REVIEW—FINDINGS IN EQUITY CASES.

The rule obtaining on writs of error that, when there is any material evidence tending to support the verdict of a jury, the appellate court will not review the evidence, does not obtain in favor of findings in equity cases which come up on a broad appeal, especially when it appears that all the evidence was in the shape of depositions, and not given orally before the court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3970–3978; Dec. Dig. § 1009.*]

2. CONTRACTS (§ 155*)—CONSTRUCTION—CONSTRUCTION AGAINST PARTY PREPARING CONTRACT.

Where a contract was on a regular printed form prepared and used generally by one of the parties, and there is any doubt as to its meaning, it should be construed most strongly against such party.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 736; Dec. Dig. § 155.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3.** CONTRACTS (§ 143*)—CONSTRUCTION—CONSTRUING PROVISIONS TOGETHER.

In construing a contract that is ambiguous, its various provisions are to be construed together, and in the light of the situation of the parties, keeping in mind the object that was sought to be attained.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 723; Dec. Dig. § 143.*]

**4.** SALES (§ 119*)—CONSTRUCTION—CONTRACT FOR PURCHASE OF MACHINE—BREACH.

Defendant was building an ice-making plant, and after it had purchased two gas engines, which was known to complainant, the latter submitted a written proposal, which was accepted, to sell to defendant an ice machine, and also a certain make of drive chain to connect the machine "with the gas engines furnished by the purchaser." The machine was to be installed and tested under the supervision of complainant for 30 days, during which time it was guaranteed to produce 50 tons per day of merchantable ice, and at the end of that time was to be accepted by defendant if satisfactory, and, if not, rejected. The drive chains called for were equipped with a spring compensating device, but complainant induced defendant to accept a different kind without such device, to which it agreed only on condition that the maker would guarantee it to give perfect satisfaction. Such guaranty was not given, but defendant was not informed of the fact. When the plant was started, it was found that the chain whipped to such an extent as to be dangerous, and it was stopped, no ice having been made. Complainant refused to furnish a different chain, insisting that defendant furnish different or more efficient power. Defendant then gave notice to proceed with the test, which was not done, and at the end of 30 days rejected the plant, and complainant brought suit to foreclose a mortgage given to secure notes for the price of the plant. *Held* that, under the facts shown, complainant made the substitution of chains at its own risk, and should have furnished the one called for by the contract before it could charge the failure upon the engines, which it knew were to be used when the contract was made, and which, as the preliminary test showed, produced sufficient power; that, having failed to do so or to proceed with the test, defendant was justified in rejecting the plant, and could not be held liable therefor.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 293; Dec. Dig. § 119.*]

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

Suit in equity by the Fred W. Wolf Company against the Mt. Vernon Refrigerating Company. Decree for complainant, and defendant appeals. Reversed.

Prior to January 4, 1906, the Mt. Vernon Refrigerating Company, appellant (hereinafter referred to as the Ice Company), purchased of the Elyria Gas Engine Company two gas engines of 100 horse power each. On January 4, 1906, the Fred W. Wolf Company, appellee (hereinafter referred to as the Wolf Company), submitted on one of its regular printed forms a proposition to the Ice Company to furnish it one block ice plant of 50 tons ice-making capacity daily, to be driven from power furnished by the Ice Company, which was known to be two 100 horse power gas engines, the machinery and material, terms and conditions being specified in detail. The proposition was on January 7th accepted by the Ice Company and in that form made the contract between the parties. This contract was on March 24th annulled by mutual consent, and on the same day a second contract, also on a like printed form, was entered into between the parties, differing only from the first in respect to the security to be given by the Ice Company.

The contract of March 24th is the basis of this suit, and provides, among many other things not necessary to mention, the following:

That the Wolf Company was "to furnish, f. o. b. cars at Mt. Vernon, Ohio, in complete shipping order and condition, one block ice plant of fifty tons ice-making capacity daily, consisting of the following machinery and material. * * *

"Two double acting No. 16 A Wolf-Line Compressors of 14 in. bore x 30 in. stroke. * * *

"Compressors to be driven from power furnished by purchaser [Ice Company].

"For driving the two compressors * * * we propose to furnish Renold silent chain drives, which will include necessary sprocket wheels, bearings, chain, etc., to connect the gas engines furnished by purchaser. * * *

"The machinery herein specified, when operated continuously and in accordance with our instructions, will produce fifty tons of merchantable ice per day of twenty-four hours. * * *

"It is understood purchasers will furnish the required power for operating the machinery and will also furnish an ample supply of condensing water at a temperature not above 60 degrees F. * * *

"After the plant is started, we will furnish an engineer to have charge of its operation for thirty days, during which time we will do the work and produce the guaranteed results herein specified. * * * At the end of the above-mentioned 30 days you shall accept or reject the plant, it being understood, however, that if it shall meet the requirements of this proposition, it shall be accepted. If rejected, you shall notify us in writing thereof and hereby permit us to enter the premises and remove our equipment without charge to you and upon refunding to you whatever money has been paid us. An acceptance after the above-mentioned period shall be in full discharge of agreements hereinbefore contained. It is understood we are to furnish one competent man to superintend and assist in the erection of the machinery herein mentioned, and that the purchasers will supply all other skilled and common labor in sufficient quantity and competency to install the apparatus in a thorough manner. * * *

"It is especially agreed that there are no promises, agreements, or understandings not embodied in this contract."

Four days after the first contract was made, and on January 11, 1906, the Wolf Company entered into correspondence with Morse Chain Company with the view of obtaining information which it subsequently used to induce the Ice Company to agree to substitute the Morse chain power transmission for the Renold silent chain drive provided for in the contract. After much correspondence between the Wolf Company and Morse Company, and between the Wolf Company and the Ice Company, the Wolf Company succeeded in inducing the Ice Company on February 19, 1906, to agree to the change upon the condition that the Morse people guarantee their chain to run and give perfect satisfaction.

The extent of the guaranty given by the Morse Company is contained in its letter of February 25th to the Wolf Company, which, after acknowledging receipt of the order for the chain drives, adds: "The above drives would, we think, prove both efficient and durable and would be glad to make our usual guaranty on same to replace all defects in workmanship or material and keep in operation for a period of one year after date of installation." The extent of this guaranty was not communicated to the Ice Company. The Renold chain was equipped with a spring compensating device, and the Morse chain, substituted for it, was not. This device is intended to neutralize or absorb the variation in the speed of the engines.

The gas engines and the ice machinery had been set by June 15th under the supervision of the Wolf Company, and the Morse chain device was installed for transmitting the power to the ice machinery. On June 19th the condensors were subjected to the air test before being charged with ammonia, as required by the contract, and proved satisfactory, the engines sending the pressure up to 300 pounds. On June 26th the ammonia test was begun under the supervision of the Wolf Company. During this test it was discovered that five or six of the spokes of the sprocket wheel on the compres-

sors were broken. The test was suspended to afford the representative of the Wolf Company an opportunity to correspond with the company, which resulted in sending within a few days to the plant an additional representative of the Wolf Company and also one from the Morse Chain Company. At the joint request of these two representatives, the engines and machinery were again started. These tests developed that the Morse Power Transmission chain whipped to such an extent that it was dangerous, if not impossible, to operate the machinery with it. It is fairly clear that the spokes of the sprocket wheel were broken by this whipping of the chain. The result of this test was unsatisfactory and the experiment admittedly unsuccessful.

From about July 10th, the time it was discovered that the sprocket wheel was broken and that the chain drive whipped to such an extent as to render it dangerous to operate the plant with it, to August 1st, nothing was done by either party toward running the plant. Each was busy in an effort to place upon the other the responsibility of the failure of the machinery to make ice in quantities sufficient to meet the guaranty of the Wolf Company; the Ice Company insisting that the Morse drive chain caused the failure, and that the Wolf Company should provide a different and efficient device for power transmission, and the Wolf Company insisting that the failure was due to the inefficiency of the gas engines, and that the Ice Company should remedy this by either substituting a different power or by furnishing a larger flywheel, or a different power transmission device.

There was evidence on complainant's part that a heavier flywheel would have overcome the variation in the speed of the engine. The manufacturers of the engines, however, declared it impossible to put on flywheels heavy enough to accomplish the required regulation. On August 1st the Ice Company notified in writing the Wolf Company that the 30 days' test of the ice plant would begin August 2d, and that 30 days from that date the Ice Company would accept or reject the plant according to the terms of the contract. The Ice Company ran its engines 12 hours a day for 30 days from August 2d, but not connected with the ice machinery. The Wolf Company made no effort during this time to manufacture ice with this plant, and at the expiration of the 30 days the Ice Company notified the Wolf Company that it rejected the ice manufacturing machinery.

It should be stated that for this ice manufacturing machinery the Ice Company at the time of making the contract paid in cash $6,250, and executed its three promissory notes for $6,250 each for the deferred payments to the Wolf Company, due, respectively, on November 1, 1906, and on June and November 1, 1907, with interest at 6 per cent. per annum from date.

These notes were secured by a mortgage on certain real estate and also on certain machinery, goods, and chattels. Under the terms of the notes and mortgages, the notes all matured, and the bill in this case was filed to foreclose the mortgage and apply the proceeds of the property to the satisfaction of the notes with interest, etc.

J. B. Waight and Murray Seasongood (Waight & Moore, Paxton, Warrington & Seasongood, and Ewalt & Ewing, on the brief), for appellant.

John E. Mac Leish (Booth, Keating, Peters & Pomerene and Scott, Bancroft & Stephens, on the brief), for appellee.

Before SEVERENS and KNAPPEN, Circuit Judges, and Mc-CALL, District Judge.

McCALL, District Judge (after stating the facts as above). This case is before the court on an appeal by the defendant from a decree against it of the United States Circuit Court for the Southern District of Ohio.

It is a case in equity, and all the evidence was presented in the form of depositions and exhibits.

The first question to which the attention of the court is challenged relates to the extent that an appellate court will review the evidence in passing upon the findings of fact by the trial court.

[1] The rule obtaining on writs of error that, when there is any material evidence tending to support the verdict of a jury, the appellate court will not review the evidence, does not obtain in equity cases which come up on a broad appeal. Especially is this so when it appears that all the evidence introduced before the trial court was in the shape of depositions, and not given before the court orally. Ridings v. Johnson, 128 U. S. 218, 9 Sup. Ct. 72, 32 L. Ed. 401; Johnson v. Harmon, 94 U. S. 371, 24 L. Ed. 271; Garsed v. Beall et al., 92 U. S. 684, 23 L. Ed. 686; The Santa Rita, 176 Fed. 890, 100 C. C. A. 360, 30 L. R. A. (N. S.) 1210; Waterloo Min. Co. v. Doe, 82 Fed. 51, 27 C. C. A. 50.

There is practically no controversy as to the material facts in the case. The Wolf Company guaranteed the machinery sold by it to produce 50 tons of merchantable ice daily, when the plant was installed and operated under its direction and management, according to the terms of the contract. The plant was installed under its supervision, and not only failed to produce the guaranteed daily output, but it failed to produce a pound of ice. The nub of the controversy is whether this failure is attributable to the fault of the appellant or the appellee. Was the contract breached by the one or the other of the parties to it? A correct answer to this question depends upon a proper construction of the contract.

[2] As has been stated, the contract entered into was upon a regular printed form of proposal, prepared and generally used by the Wolf Company in the sale of its ice manufacturing machinery, and, if there is doubt as to the true meaning of the contract, it should be construed most strongly against the Wolf Company.

In Christian v. First Nat. Bank (8th Circuit) 155 Fed. 709, 84 C. C. A. 57, Judge Van Devanter, speaking for the court, said:

"The language of the agreement is that of the plaintiff and his codepositors, and, if there be any doubt as to its true meaning, it is both just and reasonable that it should be construed most strongly against them. Noonan v. Bradley, 9 Wall. 394, 407, 19 L. Ed. 757; Texas & Pacific Ry. Co. v. Reiss, 183 U. S. 621, 626, 22 Sup. Ct. 253, 46 L. Ed. 358; Osborne v. Stringham, 4 S. D. 593, 57 N. W. 776.
"Of course, effect must be given to the intention of the parties, and, if that is made plain and certain by the agreement, every part of it being duly considered, the considerations and rules of interpretation to which we have referred are without application."

[3] Not only so, but in construing a contract that is ambiguous its various provisions are to be considered together, and in the light of the situation of the parties, keeping in mind the object that is sought to be attained. McKell v. C. & O. Ry. Co., 175 Fed. 321, 99 C. C. A. 109; Hull Coal Co. v. Empire Coal Co., 113 Fed. 256, 51 C. C. A. 213.

[4] Turning now to the contract, we find the facts to be that the Ice Company had purchased two 100 horse power gas engines for the purpose of using them to furnish the power for operating an ice plant

which it proposed to establish. The Wolf Company manufactured and sold ice manufacturing machinery, and it submitted a proposition to the Ice Company to sell to and install for it ice manufacturing machinery, which, when connected with the gas engines according to the terms of the proposition, and operated by it, was guaranteed to produce 50 tons of ice daily. The purpose of the parties was to install an ice plant of 50 tons daily capacity.

Gas engines were to be used as the motive power, and this was known to the Wolf Company as is evidenced by the terms of the contract, as follows:

(1) "For driving the two compressors * * * we propose to furnish Renold silent chain drive * * * to connect to the gas engines furnished by purchaser."

2. The Wolf Company recognized the reservation of the title of the Elyria Gas Engine Company to the two gas engines as per its contract with the Ice Company, dated December 22, 1905.

That the Wolf Company had this information before making the contract is also clearly established by the evidence in the case.

In the light of all the evidence, we think the proper construction of the contract is that the Wolf Company agreed to furnish the Ice Company machinery to manufacture ice to be driven with the power produced by the two gas engines that the Ice Company had purchased, when connected therewith by means of the Renold silent chain drive, and that the Wolf Company contracted to make this connection.

The engines, when tested, produced 300 pounds pressure, which was more than sufficient to drive the machinery.

But it is urged that the speed of the engines was irregular, and that this produced a whipping of the drive chain. If that be true, then the defect was not in the quantity of power produced by the gas engines, but in its quality.

The Wolf Company had been engaged for years in manufacturing ice-making machinery and installing it. This was the first effort that it had made to drive its ice machinery with gas engines. Fred W. Wolf, president of the Wolf Company, expressed grave doubts if it could be successfully done.

Those composing the Ice Company were novices at the business. They had purchased gas engines because natural gas was abundant and cheap in their section, and for that reason they preferred to use it as a fuel.

This was explained to Mr. Wolf, when he expressed a doubt as to the sufficiency of the gas engines, and suggested that steam power be substituted. Nevertheless, the Wolf Company contracted to sell to the Ice Company and install an ice plant to be operated or driven by the Ice Company's gas engines by means of a chain, and guaranteed that it would produce 50 tons of ice daily. That the experiment was a failure is not more than Mr. Wolf had predicted. The failure was not because the gas engines did not produce sufficient power. It was because the power was not uniform, and caused the chain drive to whip.

This characteristic in the power produced by gas engines was known to the Wolf Company, and also, perhaps, to the Ice Company. The latter company had intended to overcome or neutralize this irregularity by the use of a spring compensating device in connection with the Renold chain. This is what it purchased under the contract. For some reason not very clear, but likely because the Morse chain was cheaper than the Renold chain, the Wolf Company pressed upon the Ice Company the proposition to allow it (the Wolf Company) to substitute the Morse for the Renold chain. This the Ice Company, after much correspondence, finally consented to, upon condition that the Morse chain was as good as the Renold chain with the spring compensating device, and that the Morse Company would guarantee its chain to run and give perfect satisfaction. The Ice Company had no communication with the Morse Company, but relied upon the Wolf Company to furnish the machinery bought of it, or something guaranteed to be equally as good and to give perfect satisfaction.

The Morse Company made no such guaranty of its chain to Wolf as was required to be done by the Ice Company as a condition to its consent to make the substitution, but the Wolf Company made the substitution notwithstanding. This, we think, it did at its own risk.

The Wolf Company, having made the substitution of the Morse chain, without the spring device, for the Renold chain with it, and that too in the absence of the guarantee required by the Ice Company, without informing the Ice Company, when it developed that the ice plant could not be run because of the whipping of the Morse chain, should, in good conscience and equity, at least, have applied the spring compensating device and further tested it. This it did not do. Indeed, we think that under the contract and the evidence in this case that before the Wolf Company could be entitled to the relief sought in its bill, if the Morse chain both with and without the spring device had been tried and failed, it should have then furnished the Renold silent chain drive, as originally contracted for.

In view of this record, we are not called upon to determine the question of fact whether a heavier flywheel would have accomplished the required regulation of speed, nor, in case the Renold chain had been tried and found ineffective, what defendant's duty would have been with respect to trying such heavier flywheel.

It is urged that the Ice Company contracted to furnish the required power to operate the plant, and that, if the power furnished by it was insufficient in quantity, that it was the duty of the Ice Company to furnish a different motive power that was sufficient, or, if it was deficient in quality, it was the Ice Company's duty to remedy that by furnishing a means of power transmission that would correct the fault. This insistence is based upon the provision "to furnish the required power" used in the contract, and there would be much force in it if the contract contained only that provision in relation to this subject. This is not the case, however. And that provision must be construed in the light of all the other provisions therein. The words "required power" are limited and defined by the words, which also appear in the contract, "the gas engines furnished by the purchaser,"

that being the motive power already provided when the contract was made, and it is a most reasonable conclusion that that was the motive power the parties understood was to be used in operating the plant.

Meager reference is made in the brief of counsel for appellee to the allowance of its counterclaim. Counsel for appellant state in their brief that:

"The demurrer of appellee was sustained to the cross-bill of appellant and the cross-bill was dismissed. * * * No error is assigned in this court to the action of the trial court in sustaining appellee's demurrer."

There is nothing in the record that warrants us in expressing an opinion as to the validity of the counterclaim, nor as to the action of the trial court in sustaining a demurrer to a cross-bill, since the record does not show any issue joined on the cross-bill, nor is there any assignment which can properly be construed as relating thereto.

From what has been said, it follows that we are of the opinion that the Wolf Company breached its contract with the Ice Manufacturing Company, and that the Ice Company was justified in refusing the machinery, and the decree of the court below will therefore be reversed and the bill dismissed, with costs.