## JACKMAN v. CONTINENTAL NAT. BANK et al.

(Circuit Court of Appeals, Eighth Circuit. December 8, 1926.)

No. 7376.

**1. Banks and banking ☞260(3)—National bank held to have taken stock only in trust to sell, if possible, and not to have agreed to look to it only for payment of note.**

Where national bank's receipt for its own stock, delivered to it at time of making loan, recited that it held such stock ."in trust for (borrower's) account being authorized to sell any part of it, * * * provided we can realize for you $106 per share or better, * * * and it is agreed that the stock will be sold by us, and your note liquidated from the proceeds of such sales," *held*, bank took stock only in trust, to sell, if possible, for accommodation of borrower, and had not agreed to look to it only for payment of note.

**2. Banks and banking ☞260(3)—Statute held to preclude holding that national bank had agreed to look only to proceeds of certain of its own stock delivered to it for payment of note (Comp. St. § 9762).**

Where bank's receipt for its own stock, delivered to it on making of loan, recited that it held the stock "in trust," and was "authorized" to sell it at a certain price, and further, "it is agreed that the stock will be sold by us and your note liquidated from the proceeds of such sales," *held* Comp. St. § 9762, prohibiting any national banking association from purchasing any of its own capital stock, precluded holding that bank had agreed to look to proceeds of note alone for payment.

**3. Contracts ☞153—Lawful constructions of contract will be adopted, if reasonable and permissible.**

When a contract is open to two constructions, the one lawful and the other unlawful, the former must be adopted, if reasonable and permissible.

**4. Banks and banking ☞261(1)—Contract whereby national bank agreed to look only to proceeds of its own stock for payment of note held void even as between parties (Comp. St. § 9762).**

Alleged contract by which national bank agreed to look only to proceeds of certain of its own stock, deposited with it for payment of note, if established, *held* void under Comp. St. § 9762, even as between the parties, notwithstanding rule precluding debtors, borrowers, and private parties generally from complaining of unwarranted exercise of powers by national banks.

**5. Banks and banking ☞261(3)—National bank contracting beyond its power is not liable for anything beyond what it has received.**

Undertaking by national bank beyond its power to contract will not support action against it to recover anything beyond value of what it has actually received and enjoyed.

**6. Banks and banking ☞261(3)—National bank, making unauthorized loan, and borrower held not in pari delicto as affecting bank's right to set up its want of power (Comp. St. § 9762).**

National bank, making loan on security of its own stock, or agreeing to look only to certain pledged stock for payment of note, in violation of Comp. St. § 9762, and borrower, *held* not in pari delicto as affecting right of bank to set up its want of power to make the agreement alleged.

Appeal from the District Court of the United States for the Western District of Missouri; Albert L. Reeves, Judge.

Suit by R. C. Jackman against the Continental National Bank and others. Decree for defendants, and plaintiff appeals. Affirmed.

Justin D. Bowersock, of Kansas City, Mo. (Bowersock, Fizzell & Rhodes, of Kansas City, Mo., on the brief), for appellant.

M. M. Bogie, of Kansas City, Mo. (Henry L. Jost, of Kansas City, Mo., on the brief), for appellees.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and PHILLIPS, District Judge.

VAN VALKENBURGH, Circuit Judge. [1] In April, 1922, appellant was the owner of 275 shares of the capital stock of the Continental National Bank, a national banking association organized under the laws of the United States, with its place of business in Kansas City, Mo. On April 28, 1922, ap-

pellant executed and delivered to said bank his promissory note for the sum of $10,437, payable on demand, with interest from date at the rate of 6 per cent. per annum. Concurrently therewith, through his agent Charles Beggs, appellant delivered to said bank 100 shares of said capital stock, and the president of the bank acknowledged receipt thereof by letter in words and figures following:

"Exhibit F.

"Kansas City, Mo., April 28, 1922.

"Mr. R. C. Jackman, Lawrence, Kansas, —My dear Mr. Jackman: Mr. Beggs of the H. P. Wright Investment Company has to-day handed us your note of April 20th, payable to this bank on demand for $10,437.00, and we have paid to him this amount in cash.

"This letter will also acknowledge receipt from Mr. Beggs of certificate No. 1205 for 100 shares of capital stock of this bank. This we are to hold in trust for your account, being authorized to sell any part of it at any time we desire, providing we can realize for you $106 per share or better. The entire proceeds of any sale to be credited on the above described note, and it is agreed that the stock will be sold by us and your note liquidated from the proceeds of such sales.

"Very truly yours,
"J. F. Meade, President."

The sum of $10,437, the consideration for said note, was credited to the account of H. P. Wright Investment Company, with which Beggs was associated, and appellant received for it Fidelity Trust certificates of that value.

In January, 1923, the appellee bank voted to liquidate its affairs, and appellees Cleary, Hagerman, McDermand, Smith, and Meade were named as a liquidating committee for that purpose. At the time this suit was instituted the creditors of said bank had been paid in full, and stock dividends to the amount of 30 per cent. had been declared. Appellant demanded of the liquidating committee the sum of $5,250, being the accrued dividend upon 175 shares of stock held by him. Payment was refused for the assigned reason that appellant was indebted to the bank in the sum of $10,437, with accrued interest from January 31, 1925, no part of which had been paid. July 8, 1925, appellant filed his petition to recover the dividends alleged to be due. Appellees answered, setting up, by way of counterclaim, the amount due on said note. For reply, appellant admitted the execution and delivery of the note, but denied that he had borrowed from

the bank the sum named therein; that as a part of the same transaction the bank agreed to sell the 100 shares deposited with it, and to liquidate the note from the proceeds thereof. Appellant, therefore, denied any indebtedness to the bank which could be interposed by way of set-off or counterclaim to his demand for dividends.

In their answer appellees prayed judgment for the amount of the note with interest thereon, and, further, that said judgment be decreed a charge against the interest and share of the plaintiff in the liquidating fund of the appellant bank. This prayer was conceived to convert the suit into a proceeding in equity, and the following stipulation was filed: "It is hereby stipulated by the above-named parties that, by reason of the equitable defenses set up, and the equitable relief prayed in the answer, this entire cause and all issues therein, may be heard from the equity side of the court without the intervention of a jury, and, in accordance with such agreement, said cause is now submitted to the court for decree upon the pleadings and the evidence heretofore taken."

The court entered a decree in favor of appellee bank in the sum of $6,502.63, being the amount of the note with accrued interest, less dividends computed to be $5,870.-09. The judgment in favor of the bank was decreed to be a special lien and charge against such other and further dividends and indebtedness as might accrue and be owing to appellant by said bank.

The controversy centers upon the nature of the transaction whereby appellant's 100 shares of bank stock were deposited with appellee bank. Appellant claims that the closing sentence of Exhibit F intended to, and in terms does, relieve him from any further liability on the note; that the appellee bank agreed, not only that the stock should be sold, but that the note should be liquidated from the proceeds of such sale. Appellees claim such interpretation is inconsistent with the provision that the stock was to be held in trust, and that the bank was not authorized to sell any part of it, unless it could realize $106.00 per share or better. They contend that the exhibit must be read in its entirety, and, when thus read and harmonized, the concluding sentence amounts to no more than an agreement to sell the stock at the specified price, if possible, and that the proceeds of any sale made should be applied to the liquidation of the note. They point out that the interpretation urged by appellant would amount to a sale of the stock to the bank, or a pledge of the same as collateral for the

note; that either of these acts would be violative of express prohibitions contained in the National Banking Act. It is, of course, conceded that the stock was not sold at any price in the sense contemplated by Exhibit F. In our judgment, the exhibit upon which reliance is placed is not without ambiguity, and for better understanding of its terms resort must be had to the circumstances leading up to the transaction as disclosed by the testimony.

The witness Beggs, who acted as the agent of appellant, and was called by appellant to sustain the issues upon his part, testified as follows:

"We had some Fidelity Trust Company trustee certificates for sale, and we offered them for sale. Mr. Jackman advised that he was interested in purchasing them, and also advised that he would like to sell 100 shares of Continental. * * * I tried to sell the stock.

"Q. Did you go to see Mr. Meade with regard to it? A. I did.

"Q. What conversation did you have with Mr. Meade about it? A. I believe I had two or three. I believe the first one was that he was not interested in buying the stock, and asked me whose stock it was. I didn't feel at liberty to tell him, and I don't know whether at that time he suspected that it was Mr. Jackman's stock or not; but the result of the conversation was that Mr. Meade volunteered this loan to Mr. Jackman—a personal loan.

"Q. That is, Mr. Meade told you he would make Mr. Jackman a personal loan. A. Yes; Mr. Meade told me Mr. Jackman's note was good at the bank if he wanted to make a personal loan.

"Q. Did you communicate that to Mr. Jackman? A. I did. * * *

"Q. Did Mr. Jackman make some reply? A. Yes, sir. * * *

"Q. What did you tell Mr. Meade that Mr. Jackman had said? A. I believe I told Mr. Meade that Mr. Jackman wanted to sell the stock. * * * My recollection is that Mr. Meade offered this loan, and that he did not have a place for the stock at this time— something like that, but if Mr. Jackman wanted to borrow the money—or I believe at that time the transaction had been made known to Mr. Meade through permission I had from Mr. Jackman, and Mr. Meade offered to make a loan and accept this stock in trust. The transaction, I believe, was based on that condition—the stock was to be taken and sold at 106, if it could be sold. That is my recollection of that.

"Q. Did you communicate that to Mr. Jackman? A. I had several conversations with Mr. Jackman. * * *

"Q. Did you receive the note and stock from Mr. Jackman? A. Yes, sir.

"Q. And what did you do with them? A. I believe I took them, personally, over to the bank. * * * I delivered the note and the Continental National stock, and got credit from the bank for the amount."

Upon cross-examination the witness Beggs stated that on April 28, 1922, his company was offering for sale Fidelity Trust certificates, and had on hand for sale such certificates to the value of $10,437. Witness sought to interest Jackman in the purchase of those certificates, and Jackman offered to sell 100 shares of Continental National Bank stock in order to get the money to take up these certificates. Witness also undertook to interest Mr. Meade, president of the Continental Bank. He (Beggs) never understood that Meade was buying the Continental Bank stock, or that the bank was buying it, but the bank was going to receive it in trust for the account of Mr. Jackman, and try to market it for not less than $106. Witness could find no market for the Continental Bank stock at that time. He stated that his conversation with Meade was to the effect that he (Meade) was to market it, if possible, at $106 or better, and, if he could market it for that, the proceeds of the sale would apply as a credit on the note, and, if there was anything left, the bank was to account to Jackman for the remainder. The testimony of Meade is to the same effect.

Appellant testified to a telephone conversation with Meade in which the latter "told me it wasn't necessary for me to sell that stock; that they would be glad to loan me any amount of money I wanted to buy the Fidelity Trust certificates. I told him that didn't serve my purpose, as I was endeavoring to clean up, and wouldn't undertake any new obligation at that time. * * * I told him I didn't care to make the trade unless I could dispose of the stock—that I wouldn't undertake any new obligation.

"Q. Was any arrangement made at that time, or not? A. No, sir.

"Q. And the negotiations after that were all through Mr. Beggs? A. They were.

"Q. What did you do in closing the transaction? A. I signed the note, indorsed the stock, and sent it to Mr. Beggs, and told him he should get the proper receipt reflecting the arrangement he had made."

On April 27th, the day preceding the

making of the note and the deposit of the 100 shares of stock, appellant wrote Meade as follows:

"Referring to the trade which H. P. Wright Investment Company made with you on 100 shares of stock which you were to sell at not less than $106 net to me, and on which they were to receive Fidelity Trust certificates, I have suggested to Mr. Beggs that I think the proper way to handle this would be to take a receipt from the bank for the stock reciting the conditions of the sale. The proceeds of the 100 shares of stock should, of course, be used to pay off the note of $10,437, and the balance come to me. When this is sold I will apply what balance there is of $163 on some of the notes which I have in your bank."

Appellant testified that he expected, if the stock did sell at $106 per share, the excess should come to him; that "the stock was not turned over to Mr. Meade or the bank through Mr. Meade to apply any way they liked, but they had to apply it on the note, and they were not permitted to sell it for less than 106 per share. * * * I was expecting to receive $106 for the stock. It would be immaterial whether they sold it for $102 or any price."

Upon cross-examination appellant testified that he was a stockholder and director in the bank, and knew that the bank could not deal legally in its own stock; that he had the stock for sale, and wanted to sell it to anybody that would buy it.

It will be noted that this transaction occurred the latter part of April, 1922. The bank went into liquidation in January, 1923. Beggs testifies that he made diligent efforts to sell appellant's stock, and was unable to do so. The inference is warranted that it was impossible to sell the stock at the premium demanded, if at any price, then, or thereafter. Both Beggs and Meade asserted that no purchase was understood to be made by the bank or any one for it. The stock has not been sold at any price. No claim is made that the bank, through lack of diligence, has breached its agreement to sell the stock and liquidate the note from the proceeds of the sale. The note was given in the usual form, and draws interest. No contingencies are expressed in it. In his letter of April 27th, appellant reserves control of the application of the proceeds when sale is made. Clearly the application was to be contingent upon sale, and no sale has taken place. It is conceded that the closing negotiations were all conducted by Beggs, the agent of appellant.

His testimony and that of Meade are in decided conflict with Jackman's theory. Appellant relies strictly upon the literal terms of the closing sentence of the Meade letter of April 28th. But, in our judgment, the provision that the bank was to hold the stock in trust for appellant's account with authority to sell, provided—and provided only—that it could realize for appellant $106 per share or better, cannot be ignored; this, taken in connection with the testimony of the witnesses by and through whom the transaction was consummated, convinces that the bank undertook the sale of the stock merely as an incidental accommodation to appellant in the hope and, possibly, in the expectation of both, that the stock might be sold as authorized and the note liquidated by the proceeds; but by this arrangement the note, as a subsisting obligation, was in no wise impaired.

This rule of construction finds uniform support in this and other jurisdictions. In United States Fidelity & Guaranty Co. v. Board of Commissioners of Woodson County, Kansas (C. C. A.) 145 F. 144, this court said: "The actual intent and meaning of the parties when the agreement was made, deduced from the entire contract, from its subject-matter, from the purpose of its execution, and from the situation and circumstances of the parties when they made it, must prevail over the dry words of the instrument, inapt expressions, and careless recitals therein, unless that intention runs counter to the plain sense of the binding words of the agreement."

The same thought is thus expressed by the Court of Appeals, Sixth Circuit, in Mt. Vernon Refrigerating Co. v. Fred W. Wolf Co., 188 F. 164: "In construing a contract that is ambiguous its various provisions are to be considered together, and in the light of the situation of the parties, keeping in mind the object that is sought to be attained."

In Canadian Northern Ry. Co. v. Northern Miss. Ry. Co. (C. C. A.) 209 F. 758, 761, Judge Sanborn, speaking for this court, says: "Every provision of an agreement should have effect rather than that part should perish by construction and the intention of the parties to a contract must be deduced, not from specific provisions or fragmentary parts of the agreement, but from the entire contract, because the intent is not evidenced by any part or provision of it, nor by the contract without any part or provision, but by every part and term so construed as to be consistent with every

other part and with the entire contract"— citing, among other cases, Uinta Tunnel, etc., Co. v. Ajax Gold Min. Co. (C. C. A. 8) 141 F. 563. The rule in Missouri is the same. Gerber v. Kansas City, 304 Mo. 157, 181, 263 S. W. 432.

[2] Appellant must fail in this suit for another reason. Section 9762, U. S. Comp. Stat. 1916 (R. S. § 5201), provides: "No [national banking] association shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith;" etc.

Appellant insists that the closing sentence of Exhibit F compels the bank to look to its own stock, thus deposited with it, for the liquidation of appellant's note, and at once releases appellant from all obligation upon that note. If the bank received this stock as payment and satisfaction of the note, it was, in effect, a purchaser. If it bound itself to liquidate the note by sale, its act was tantamount to making the loan on the security of the shares of its own capital stock, and was violative of the spirit, if not of the letter, of the congressional prohibition. If a palpable evasion of this nature can be indulged, that prohibition, designed for the protection of stockholders and creditors alike, becomes a dead letter. In the brief, counsel for appellant say: "Plaintiff is not complaining of a breach of the bank's agreement to sell. It is relying upon the bank's agreement not to sue. He says: 'I do not owe the bank anything, because it agreed to look solely to the stock for payment and not to me.'"

[3] In our judgment, this statement brings the case squarely within the statute above quoted. The distinction sought to be drawn is unsubstantial. When a contract is open to two constructions, the one lawful, and the other unlawful, the former must be adopted, if reasonable and permissible. 13 C. J. 539; Hobbs v. McLean, 117 U. S. 567, 6 S. Ct. 870, 29 L. Ed. 940; Cooper v. Northern Pac. Ry. Co. (D. C.) 212 F. 533, 536; Cole Motor Car Co. v. Hurst (C. C. A. 5) 228 F. 280.

[4] The appellant raises the point that, even if this be true, the contract is not void as between the parties; that, where the provisions of the National Banking Act prohibit certain acts by banks, or their officers, without imposing any penalty or forfeiture applicable to particular transactions which have been executed, their validity can be questioned only by the United States, and not by private parties, citing Thompson v. St. Nicholas Nat. Bank, 146 U. S. 240, 13 S. Ct. 66, 36 L. Ed. 956, and a number of other decisions by the Supreme Court and Circuit Courts of Appeals: National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188; National Bank v. Whitney, 103 U. S. 99, 26 L. Ed. 443; Fortier v. New Orleans Bank, 112 U. S. 439, 5 S. Ct. 234, 28 L. Ed. 764; National Bank of Xenia v. Stewart, 107 U. S. 676, 2 S. Ct. 778, 27 L. Ed. 592; First National Bank v. Lanz (C. C. A. 5) 202 F. 117; Lantry v. Wallace, 182 U. S. 536, 21 S. Ct. 878, 45 L. Ed. 1218; Hood v. Wallace, 182 U. S. 555, 21 S. Ct. 885, 45 L. Ed. 1227; Morse v. United States (C. C. A.) 174 F. 539, 20 Ann. Cas. 938; Kerfoot v. Bank, 218 U. S. 281, 31 S. Ct. 14, 54 L. Ed. 1042.

In substantially all these cases either the point was raised by some third party or the borrower or his privies sought to escape liability after having received from the bank, either directly or indirectly, the pecuniary benefits of the transaction. In Thompson v. Bank the statement of the court in Logan County Bank v. Townsend, 139 U. S. 67, 77, 11 S. Ct. 496, 35 L. Ed. 107, that a disregard by a national bank of the provisions of the act of Congress forbidding it to take a mortgage to secure an indebtedness could not be taken advantage of by the debtor was approved.

In National Bank v. Matthews, the court said: "We cannot believe it was meant that stockholders, and perhaps depositors and other creditors, should be punished and the borrower rewarded, by giving success to this defence whenever the offensive fact shall occur."

In Kerfoot v. Farmers' & Merchants' Bank, Mr. Justice Hughes says: "In the absence of a clear expression of legislative intention to the contrary, a conveyance of real estate to a corporation for a purpose not authorized by its charter, is not void, but voidable, and the sovereign alone can object. Neither the grantor nor his heirs nor third persons can impugn it upon the ground that the grantee has exceeded its powers."

The following language from National Bank v. Matthews is approved: "Where a corporation is incompetent by its charter to take a title to real estate, a conveyance to it is not void, but only voidable, and the sovereign alone can object."

So, in Morse v. United States, a criminal case, it was contended that a purchase by the bank of shares of its own stock would extinguish the stock thus purchased so that there would be on that account no item

of property to include in a report to the Comptroller of the Currency. This defense was rejected.

In First National Bank v. Lanz it is suggested that the acceptance by a national bank of a pledge of its own stock to secure a loan is valid except as against the United States after the pledge has been executed by a sale.

In Lantry v. Wallace the court said: "It cannot be held that the purchase by the bank of its own shares of stock was void. It was of course a matter of which the government by its officers could take cognizance; and it may be that it was a matter of which stockholders, having an interest in the proper administration of the affairs of the bank, could complain in a proceeding instituted by them to restrain the bank from violating the statute. But, when the violation of the statute has occurred, it is not a matter of which a shareholder can complain in order that he may be relieved from the liability attaching to him as a shareholder."

In National Bank of Xenia v. Stewart, this further suggestion is made: "If, therefore, the prohibition can be urged against the validity of the transaction by any one except the government, it can only be done before the contract is executed, while the security is still subsisting in the hands of the bank. It can then, if at all, be invoked to restrain or defeat the enforcement of the security. When the contract has been executed, the security sold, and the proceeds applied to the payment of the debt, the courts will not interfere with the matter."

In Thompson v. Bank it is pointed out that: "It would defeat the very policy of an act intended to promote the security and strength of the national banking system if its provisions should be so construed as to inflict a loss upon the banks, and a consequent impairment of their financial responsibility."

The gist of these decisions, therefore, is that debtors, borrowers, and private parties generally, cannot complain of such unwarranted exercise of power by national banks, particularly after the power has been exercised to the extent of a sale of the securities and an application of the proceeds, and that, as against the bank itself, the government alone can interfere, by proceedings in ouster and dissolution.

There is nothing in the cases cited and reviewed which denies the right of the bank itself to assert the nullity of an act which is ultra vires. Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 11 S. Ct. 478,

35 L. Ed. 55; McCormick v. Market Bank, 165 U. S. 538, 17 S. Ct. 433, 41 L. Ed. 817; California Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 42 L. Ed. 198; Concord First Nat. Bank v. Hawkins, 174 U. S. 364, 19 S. Ct. 739, 43 L. Ed. 1007; Pullman's Palace Car Co. v. Central Transportation Co., 171 U. S. 138, 18 S. Ct. 808, 43 L. Ed. 108; Barron v. McKinnon (C. C. A. 1) 196 F. 933; Burrows v. Niblack (C. C. A. 7) 84 F. 111.

In the latter case it was held that the purchase of its own stock by a national bank, not for the purpose of preventing, or necessary to prevent, a loss upon a debt previously contracted, is illegal, and the bank may maintain an action at law to recover the money paid therefor. The court said: "The principal objections urged are: (1) That the validity of the purchase by the bank of its own stock can be questioned only by the government. * * * The first objection is based upon that line of decisions of which illustrations are found in Bank v. Matthews, 98 U. S. 621 [25 L. Ed. 188]; Bank v. Whitney, 103 U. S. 99 [26 L. Ed. 443]; and Thompson v. Bank, 146 U. S. 240, 13 S. Ct. 66 [36 L. Ed. 956]; but the present case, as we think, is governed rather by the principles declared in McCormick v. Bank, 165 U. S. 538, 17 S. Ct. 433 [41 L. Ed. 817], and Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831 [42 L. Ed. 198] where the line of cases mentioned is distinguished."

In McCormick v. Market Bank, supra, it is said: "The doctrine of ultra vires, by which a contract made by a corporation beyond the scope of its corporate powers, is unlawful and void, and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: The obligation of any one contracting with a corporation, to take notice of the legal limits of its powers; the interest of the stockholders, not to be subject to risks which they have never undertaken; and, above all, the interest of the public, that the corporation shall not transcend the powers conferred upon it by law."

In California Bank v. Kennedy, suit was brought against the plaintiff in error to enforce a stockholders' liability resulting from the purchase by that bank of stock in another corporation. The Supreme Court held that the want of authority so to do may be set up by a bank to defeat an attempt to enforce against it such a liability. Mr. Justice White said: "The transfer of the stock in question to the bank being unauthorized by law, does the fact that, under some circum-

stances, the bank might have legally acquired stock in the corporation estop the bank from setting up the illegality of the transaction? Whatever divergence of opinion may arise on this question from conflicting adjudications in some of the state courts, in this court it is settled in favor of the right of the corporation to plead its want of power, that is to say, to assert the nullity of an act which is an ultra vires act."

In Thomas v. Railroad Company, 101 U. S. 86, 25 L. Ed. 950, quoted with approval in Central Transportation Co. v. Pullman's Car Co., loc. cit. 55 (11 S. Ct. 486), the court said that in the case "of a contract forbidden by public policy and beyond the powers of the defendant corporation, it was its legal duty, a duty both to its stockholders and to the public, to rescind and abandon the contract at the earliest moment, and the performance of that duty, though delayed for several years, was a rightful act when done."

In the latter case, quoted with approval, under the same title, in 171 U. S. 150, 18 S. Ct. 813, 43 L. Ed. 108, the court said: "The courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties so far as could be done consistently with adherence to law, by permitting property or money parted with on the faith of the unlawful contract to be recovered back or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract nor according to its terms, but on an implied contract of the defendant to return, or failing to do that, to make compensation for the property or money which it had no right to retain. To maintain such an action was not to affirm, but disaffirm, the unlawful contract."

[5] This practice of the courts is in accord with the doctrine announced in a long line of cases of which Hitchcock v. Galveston, 96 U. S. 341, 24 L. Ed. 659, is a type. But, as said in McCormick v. Market Bank, an undertaking beyond its power to contract "will not support an action against the bank to recover anything beyond the value of what it has actually received and enjoyed."

[6] In the case at bar the appellee bank has received and enjoyed nothing of value. It has parted with funds in the sum of $10,437, upon which appellant asserts no interest has been paid. Appellant's stock, which it received in trust, has not been sold. No proceeds from it have been realized. It is still in the possession, and subject to the control, of the Continental National Bank and its liquidating officers. Liquidation

dividends have been declared, ascertained, and set apart for this 100 shares in the same manner as on all other stock. They stand to the credit of appellant when his obligations to the bank are discharged. Jackman was not only a stockholder, but a director, of the bank. He says he wanted to sell the stock to anybody that would buy it. His negotiations were with the officers of his own bank. What he sought to accomplish he knew in its essential nature to be violative of the National Banking Act. It would be unjust to the other stockholders, for whose benefit, in part, this legislative prohibition was enacted, to permit appellant to profit, to their disadvantage, by a contract of this nature. He urges that if it be held that the transaction is illegal, the parties are in pari delicto, and the court will not act at the instance of either, but will leave both parties where it finds them. This rule cannot successfully be invoked to estop the bank from setting up its want of power. But, in any event, appeal to this alleged contract was made by appellant in its reply in a case conceived to sound in equity; but whether in equity or at law, on grounds of public policy courts will not enforce an illegal or ultra vires contract. It follows that the judgment and decree must be affirmed.

And it is so ordered.