HARRIMAN NAT. BANK & TRUST CO. OF CITY OF NEW YORK et al. v. PERRY et al.

No. 22.

Circuit Court of Appeals, Second Circuit.

Nov. 30, 1936.

Hill, Lockwood & Redfield, of New York City (Samuel Seabury, Luke Burnell Lockwood, and Philip W. Lowry, all of New York City, of counsel), for defendants-appellants.

Conboy, Hewitt, O'Brien & Boardman, of New York City (Martin Conboy, David Asch, William J. Butler, and Hobart L. Brinsmade, all of New York City, of counsel), for plaintiffs-appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The complaint in the case before us alleged: (1) That defendants' testator Perry made his promissory note dated October 10, 1932, wherein he promised to pay to the order of the plaintiff Harriman National Bank & Trust Company the sum of $170,000 six months after date, with interest, and that no part of the note was paid, though payment was demanded at maturity; (2) that on October 13, 1932, defendants' testator Perry had and received $170,000, the property of the bank, and promised to pay the same, but failed to make payment after demand. The receiver of the bank thus sought recovery on a note made by Perry for $170,000 and interest and for money had and received to the same amount.

The answer admitted the making of the note by Perry and his receipt of $170,000 from the bank and that there had not been payment, and set up various defenses and counterclaims, of which the fourth, fifth, and sixth defenses were withdrawn. The trial judge dismissed the other affirmative defenses and the counterclaims, and directed a verdict for the plaintiff upon the opening of counsel.

The disposition of the case at the trial depends on the validity of the defenses and counterclaims pleaded. They were based upon an agreement dated October 6, 1931, between Perry and the bank, which recited that Perry wished to sell 162 shares of stock of the bank belonging to him and that the bank wished to act as agent for the sale of the stock. It provided that: (1) Perry should assign his shares to the bank; (2) the bank should lend Perry $170,000 for six months; (3) the bank should use its best efforts to sell the stock for Perry's account at not less than $1,400 per share and should credit the proceeds of any such sales against the principal amount due on the note of Perry; (4) if at maturity of the note any of the principal remained due, the bank agreed to renew the loan for six months and to grant further renewals until the proceeds of sale of the shares should have repaid the loan; (5) the bank should reassign to Perry any of the shares remaining unsold at the time when the loan was satisfied and should credit the latter's account with all dividends received on the stock while held by it.

The first affirmative defense alleged that the bank had agreed to continue renewing Perry's note until the proceeds of the sale of his stock were sufficient to pay it; that, although the bank had made no sales of the stock, nevertheless, after two renewals of the loan had been granted, it refused to grant a third renewal. The defendants alleged as second and third defenses and also as counterclaims that the bank had agreed to act as agent in the sale of the stock, but in violation of its agreement had neglected to use its best efforts to sell. The fourth, fifth, and sixth defenses, also set up as counterclaims, were withdrawn, and the seventh and eighth added little or nothing to the allegations in the first, second, and third. The ninth and tenth defenses, also set up as counterclaims, alleged that Perry was induced to enter into the agreement with the bank by its false representations that it intended to use its best efforts to

sell his stock at not less than $1,400 per share, whereas it had no such intention. The bank replied to the counterclaims by alleging that the agreement referred to in the answer was illegal.

In the autumn of 1931 Perry, then the owner of the 162 shares of stock of the Harriman National Bank & Trust Company, being in need of cash, decided to dispose of his stock, which was currently selling at between $1,500 and $1,600 per share. At the suggestion of his brokers, inquiry was made of Harriman, the president of the bank, as to potential purchasers. The latter told Perry's counsel that he would be glad to undertake to find a purchaser for the stock through the bank, but that it would take a little time to do this and that meanwhile the bank would be glad to make Perry a loan which would meet his immediate requirements. Harriman was then told that Perry did not want to borrow any money but wanted to sell his stock. Harriman replied that the bank could not make any loan on its own stock, but, if Perry could make a satisfactory financial statement, he, or the bank, would make the loan. In answer to this it was said that, if the stock had not been disposed of before the note matured, Perry might not be able to pay it from his other resources. Harriman said: "The bank will extend the note until the stock is sold—at $1,400 per share— * * * and we will use our best efforts to sell this stock; and if it is sold, we will apply the money to the payment of this loan; and, meantime, of course, Mr. Perry, if he comes into other resources can repay the money and the stock will be returned to him."

After the foregoing conversation, the agreement of October 6, 1931, between Perry and the bank, which has already been referred to, was executed and the stock was indorsed by Perry and delivered to the bank. It is still in the possession of the latter but is without value.

The foregoing facts were stated by defendants' counsel on opening; and he offered to prove by witnesses that the stock could have been sold within the six-month period covered by the note if the bank had used its best efforts to sell the shares, as it had agreed to do; also that the bank and Harriman had fraudulently induced Perry to enter into the agreement and at the time the contract was made had not intended to sell his stock. It was in substance stated that their purpose was to keep Perry's shares from sale, so that the efforts of Harriman and a syndicate which he had formed to maintain the price of the stock on the market might be interfered with by as few sales as possible.

After dismissing the affirmative defenses and the counterclaims, the trial judge directed a verdict for the plaintiff for $170,-000 and interest upon both the causes of action set forth in the complaint. The counterclaims were dismissed on the ground that the agreement by the bank to extend the loan until payment could be realized from the proceeds of the sale of the stock was illegal, and therefore there could be no recovery either for breach of the promise to make an effort to sell the shares or in deceit for inducing Perry by means of false representations to enter into the contract. From the judgment entered on the verdict the defendants have appealed.

The Harriman National Bank & Trust Company and its receivers contend that the agreement by the bank to look only to the proceeds of the stock for repayment of the loan was so contrary to the policy of the Banking Act as to prevent recovery under any of the counterclaims.

The defendants contend:

(1) That the Harriman Bank had the right to act as Perry's agent in selling his stock, and, if the implied promise to look only to the proceeds of sale for reimbursement was beyond its power, nevertheless that undertaking was severable and the bank would be liable for failure to use its best efforts to sell the stock.

(2) That, even if the promise to look only to the proceeds of the stock was not separable and the entire contract was beyond the power of the bank, the latter was nevertheless liable in deceit for having induced Perry to enter into the agreement, when it did not intend to use its best efforts to sell the stock as promised.

▇ We feel no doubt that the policy indicated by the terms of the National Banking Act is such as to preclude all the defenses and counterclaims interposed to the action by the plaintiffs for recovery of the loan to Perry and that the trial court properly granted judgment on their behalf for money had and received.

The statutes governing national banks so far as pertinent read as follows:

"§ 83. *Loans on or Purchase by Bank of Own Stock* No association shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchase shall be necessary to prevent loss upon a debt previously contracted in good faith; and stock so purchased or acquired shall, within six months from the time of its purchase, be sold or disposed of at public or private sale; or, in default thereof, a receiver may be appointed to close up the business of the association, according to section 192 of this title." U.S.C., title 12, § 83 (12 U.S.C.A. § 83).

"§ 592. *Embezzlement, etc.* Any officer * * * of any Federal reserve bank, or of any member bank * * * who * * * willfully misapplies any of the moneys, funds, or credits of such * * * Federal reserve bank or member bank * * * with intent in any case to injure or defraud such Federal reserve bank or member bank * * * and every person who, with like intent, aids or abets any officer, * * * in violation of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof in any district court of the United States shall be fined not more than $5,000 or shall be imprisoned for not more than five years, or both, in the discretion of the court." 12 U.S.C.A. § 592.

In view of the foregoing provisions it seems clear that a loan by a bank on, or a purchase of, its own stock is not merely an ultra vires act but also is a criminal transaction, affecting not only officers and agents of the bank but any person aiding or abetting them. The seriousness of the offense is because it is likely to deplete the assets available for creditors. While the arrangement made with Perry to look only to the proceeds of his stock and indefinitely to renew his note, so long as no sale was made, may not come within the exact words of section 83 of the statute, it falls within its meaning, and was even worse for the bank than a violation of its exact terms, because the bank was without recourse to Perry's personal obligation, as would have been the case had it made an ordinary loan secured by his shares. The assignment of the shares to the bank with a limited power of sale and a right to apply the proceeds to recoup the advance it had made was clearly intended to give it either an interest in the nature of a pledge, though the transfer was not collateral to a personal obliga-

tion, or an interest in the nature of a sale arising from a transfer of certain qualified rights in the shares for the cash payment.

██ Inasmuch as the enforcement of a contract like the one here would fly in the face of the settled policy of the National Banking Act, the receiver could properly repudiate the entire arrangement between the bank and Perry and recover in an action of indebitatus assumpsit the corporate funds which had been unlawfully diverted. Nor was it necessary to tender the stock as a condition of bringing suit, for it had become worthless. Defendants argue that the promise of the bank to use its best efforts to sell Perry's stock was severable, and that therefore an action for breach of it would lie. But the consideration for it was the assignment of the stock for an unlawful purpose, viz., to obtain from the bank a loan secured by its own stock—a consideration affected with an act which the statute forbade. Moreover, where, as here, the whole contract was tainted with illegality, the bank was entitled to repudiate it and recover its advances. The defendants could not counterclaim for breach of an unlawful contract.

██ The only question remaining is whether the defendants were entitled to recover on their counterclaim sounding in tort and based on the charge that the bank had induced Perry to enter into the agreement in consideration for its promise to use its best efforts to sell his stock, when it had no intention of fulfilling that promise. We have held that, under ordinary circumstances, such a cause of action in tort will lie. Seaboard Terminal & Refrigeration Co. v. Droste (C.C.A.) 80 F.(2d) 95, 96; Continuous Zinc Furnace v. American S. & R. Co. (C.C.A.) 61 F.(2d) 958. But, while a cause of action sounding in tort for deceit will frequently lie in spite of the fact that it may have arisen in connection with the performance of an ultra vires contract, it must fail when the recovery sought would directly promote the evil which the law has been designed to prevent, or, as applied to the present case, would deplete the corporate assets by loans on the security of the bank's own stock and thus injure the rights of creditors through the very means forbidden by the statute. In this respect the facts in the present case differ from those in Smith v. First Nat. Bank, 268 F. 780 (C.C.A.8), and Wasman v. City Nat. Bank of Knoxville, Tenn., 52 F.(2d) 705 (C.C.A.6), re-

lied on by defendants. In each of those cases an officer of a national bank, acting for the bank, obtained money from a customer in return for sales of ostensible notes which the bank neither owned nor would have had a right to deal in if they had been its property. Upon the assumption that the officers were acting within the scope of their authority and received the payments as such, the bank was held liable in deceit in the first case and for conversion in the second. In each the bank was in constructive receipt of the customer's money and was held liable in tort for damages to the latter. See, also, First National Bank of Grand Forks v. Anderson, 172 U.S. 573, 19 S.Ct. 284, 43 L.Ed. 558.

In the case at bar the bank got nothing but its own stock which it was forbidden to take by way of sale or pledge. To hold it liable in tort would take away from its creditors the money which Perry unlawfully obtained for his now worthless shares. The statute was enacted to prevent such transactions, and to permit a recovery in deceit would be a ready means of evasion, would in effect allow recovery for the breach of an illegal contract, and would bring about the result which the statute forbids. The reasoning of the Court of Appeals of the Eighth Circuit in Jackman v. Continental Nat. Bank (C.C.A.) 16 F.(2d) 728, 51 A.L.R. 336, accords with our views.

Judgment affirmed.